Muhammad Shabbaz **FARRAKHAN,** et al., Plaintiffs,

v.

Gary **LOCKE,** et al., Defendants.

No. **CS–96–076–RHW.**

United States District Court, E.D. Washington.

Nov. 13, 1997.

**1306**

Lawrence Arthur Weister, Alan Lynn McNeil, University Legal Assistance, Spokane, WA, Dennis Charles Cronin, Maxey Law Offices, Spokane, WA, for plaintiffs Muhammad Shabazz Farrakhan, Marcus X. Price, Ramon Barrientes, Timothy Schaaf, Clifton Briceno, Al–Kareem Shaheed.

Alan Lynn McNeil, University Legal Assistance, Spokane, WA, Dennis Charles Cronin, Maxey Law Offices, Spokane, WA, for plaintiffs Ernest S. Walker, Al–Kareem Shadeed, Michael D. Adams, David Conyers, George Mitchell, Michael Aivarado, Tracy Huitt, Richard Snell, Carl Maxey.

Marcus X. Price, Spokane, WA, pro se.

Dennis Charles Cronin, Maxey Law Offices, Spokane, WA, for plaintiff Bevin Maxey.

Daniel John Judge, Attorney General of Washington, Criminal Justice Division, Jeffrey Todd Even, Attorney General of Washington, Olympia, WA, for defendants, State of Washington, Mike Lowry, Governor, Chase Riveland, Sec. of Dept. of Corrections, Gary Locke, Governor, Ralph Munro, Sec. of State, Joseph Lehman, Sec. of Dept. of Corrections.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS, AND DENYING IN PART PLAINTIFFS' MOTION TO AMEND

WHALEY, District Judge.

Before the Court are Defendants' Motion for Dismissal for Failure to State a Claim (Ct.Rec.53) and Plaintiffs' Motion for Leave to Amend (Ct.Rec.66). A hearing was held in this matter on October 17, 1997. Dennis Cronin, Larry Weiser, Angel Rains, and George Vourvoulias appeared on behalf of Plaintiffs, Daniel Judge and Jeffrey Even appeared on behalf of Defendants.

As explained below, Defendants' motion to dismiss is granted as to Plaintiffs' claims for vote dilution under the Voting Rights Act ("VRA") and as to Plaintiffs' constitutional claims. Defendants' motion is denied as to Plaintiffs' claims for vote denial under the VRA. Plaintiffs' Motion for Leave to Amend is denied, except to the extent that Plaintiff Bevan Maxey[1] is added as a party.

---

1. Carl Maxey, one of the original Plaintiffs in this matter, died during the pendency of this case. Subsequent to his death, Plaintiffs have filed a motion to amend their Complaint seeking, among other things, to add Bevan Maxey, Carl Maxey's son, as a named plaintiff. For the purposes of this Order, this aspect of Plaintiffs' Motion to Amend is granted for appeal purposes, even though the claim for which the Maxeys have standing is dismissed, as explained below.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Farrakhan, Shaheed, Price, Barrientes, Schaaf, and Briceno are African-American, Hispanic–American and Native-American felons. They, along with other Plaintiffs who have since opted out, originally filed the instant action *pro se* on February 2, 1996, claiming that the State of Washington's felon disenfranchisement scheme violates the VRA as well as the First, Fourth, Fifth, Sixth, Ninth, Fourteenth and Fifteenth Amendments to the United States Constitution. Plaintiffs also lodged a complaint against the National Rifle Association ("NRA"), asserting that the NRA, along with state officials, orchestrated Initiative 593 (Washington's "three-strikes" law) with an intent to oppress racial minorities. Because none of the Plaintiffs asserted that they were incarcerated or disenfranchised under Initiative 593, the Court dismissed this claim *sua sponte* for lack of standing. The Court subsequently granted Plaintiffs' motion to assign counsel, and permitted Plaintiffs to amend their complaint. The amended complaint added Carl Maxey, an African–American registered voter, as a plaintiff, and asserted claims for relief under the VRA, and the First, Second, Fifth, Sixth, Seventh, Eighth, Fourteenth, and Fifteenth Amendments to the United States Constitution.

The focus of Plaintiffs' Complaint is Washington's felon disenfranchisement law. Under Washington's constitution, a person convicted of an "infamous crime" is ineligible to vote. Wash. Const. Art. VI, §§ 1 & 3. As defined by statute, an "infamous crime" is one that is "punishable by death in the state penitentiary or imprisonment in a state correctional facility." Wash. Rev.Code § 29.01.080. Although Washington provides for restoration of voting rights for certain felons,[2] the plaintiff felons make no allegations that they have obtained this form of redress. The Complaint alleges that minorities are disproportionately prosecuted and sentenced, resulting in their disproportionate representation among the persons disenfranchised under the Washington Constitution. Consequently, Plaintiffs allege that Washing-

ton law causes vote denial and vote dilution on the basis of race, in violation of the VRA, as well as direct violations of the United States Constitution.

## ANALYSIS

### 1. The Legal Standard Governing a Motion to Dismiss

Defendants move for dismissal under Fed. R.Civ.P. 12(b)(6). Thereunder, dismissal is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). In analyzing a 12(b)(6) motion, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Western Reserve Oil & Gas Co. v. New*, 765 F.2d 1428, 1430 (9th Cir.1985). The issue is not whether Plaintiffs will ultimately prevail, but whether they are entitled to offer evidence in support of their claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Under this liberal standard, motions to dismiss are viewed with disfavor. *Intake Water Co. v. Yellowstone River Compact Comm'n.*, 590 F.Supp. 293 (D.Mont.1983), *aff'd*, 769 F.2d 568 (9th Cir.1985).

### 2. The Voting Rights Act Claims

■ Congress enacted the VRA for the broad remedial purpose of "rid[ding] the country of racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 315, 86 S.Ct. 803, 812, 15 L.Ed.2d 769 (1966). For this reason, the VRA should be interpreted in a manner that provides "the broadest possible scope in combating racial discrimination." *Allen v. State Bd. of Elections*, 393 U.S. 544, 567, 89 S.Ct. 817, 832–33, 22 L.Ed.2d 1 (1969). In 1982, Congress amended the VRA in order to relieve plaintiffs of the burden of proving discriminatory intent, after a plurality of the Supreme Court had concluded that the pre–1982 VRA, like the Fifteenth Amendment, contained such a requirement. *See Mobile v. Bolden*, 446 U.S.

---

**2.** *See* Wash. Rev.Code §§ 9.94A.220, 9.92.066, 9.95.240 & 9.96.050.

55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). As amended, § 2 of the VRA now states:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973. Subsection (b) has come to be known as the "results test" under the VRA. As explained by the Supreme Court, "[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality" in the voting rights of various racial groups. *Thornburg v. Gingles*, 478 U.S. 30, 47, 106 S.Ct. 2752, 2764, 92 L.Ed.2d 25 (1986).

The VRA has been interpreted to apply to two types of discriminatory practices and procedures: those that result in "vote denial" and those that result in "vote dilution." Plaintiffs' Complaint alleges both.

### a. Vote Denial

### The Background of Vote Denial Claims and Application to this Case

Originally, enforcement of the Fifteenth Amendment under the VRA involved challenges of state election practices such, as literacy tests, that resulted in the denial of the right to vote to minority citizens. *See, e.g., Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970). The VRA was enacted in response to the increasing sophistication with which states were denying racial minorities the right to vote. After the Civil War and ratification of the Fifteenth Amendment, several southern states enacted facially neutral voting requirements, which had the effect of sustaining the denial of the right to vote on the basis of race. Congress created the VRA to put an end to the states' "unremitting and ingenious defiance of the Constitution." *South Carolina v. Katzenbach*, 383 U.S. 301, 309, 86 S.Ct. 803, 808, 15 L.Ed.2d 769 (1966).

In considering Plaintiffs' allegations of vote denial under the VRA, the question arises as to whether Washington's felon disenfranchisement law may be a test or device that denies individuals the right to vote on the basis of race. On its face, the VRA applies to Plaintiffs' claims. Plaintiffs are citizens, and felon disenfranchisement is a voting device. Consequently, if Plaintiffs were to prove that Washington's felon disenfranchisement scheme denies them the right to vote in a discriminatory manner, then it would be a voting device that violates the VRA. Defendants argue that the meaning of the VRA cannot simply be derived from its face. Instead, voting devices such as felon disenfranchisement laws can only fall under the VRA if Congress has plainly stated such. Otherwise the VRA would constitute an overstatement of Congress's remedial powers under § 2 of the Fourteenth Amendment.

### The Plain Statement Rule Does Not Apply to the VRA

█ Defendants claim that the VRA cannot be read in isolation in order to determine its application. Their argument is largely based on the Second Circuit case of *Baker v. Pataki*, 85 F.3d 919 (2d Cir.1996). In *Baker*, an *en banc* panel of the Second Circuit split five-to-five on the question of whether disenfranchised felons could state a claim under

the VRA.[3] Led by Judge Mahoney, the five judges favoring dismissal explained that the VRA falls under the "plain statement" rule of *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). Under this rule, if a congressional enactment would have the effect of altering the usual constitutional balance between the federal government and the states, then Congress's intention regarding the application of a statute must be made "unmistakably clear." *Gregory v. Ashcroft*, 501 U.S. 452, 460, 111 S.Ct. 2395, 2400–01, 115 L.Ed.2d 410 (1991) (citations omitted). Given Congress's silence on the issue of felon disenfranchisement at the time of the 1982 amendment to the VRA, Judge Mahoney concluded that no plain statement existed and the VRA could not apply to felon disenfranchisement statutes. *Baker*, 85 F.3d at 922.

■ The Court does not agree that the plain statement rule applies to the VRA. The Civil War Amendments to the United States Constitution have already changed the usual constitutional balance between the states and the federal government. The remedial clause of the Fourteenth Amendment was specifically created so that the federal government could police states for violations of the constitutional rights of racial minorities. *See Mitchell*, 400 U.S. at 127–28, 91 S.Ct. at 266–67. The Supreme Court has consistently recognized that Congress has the power to enforce the Fourteenth and Fifteenth Amendments through the VRA, "despite the burdens those measures placed on the states." *City of Boerne v. P.F. Flores*, — U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997); *see also South Carolina v. Katzenbach, supra; Katzenbach v. Morgan*, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966); *Oregon v. Mitchell, supra; City of Rome v. United States*, 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980). Because these amendments, on which the VRA is based, altered the federal-state balance of power as contemplated by the original constitution, the "plain statement" rule is simply inapplicable in the context of the VRA. *Bak-*

*er*, 85 F.3d at 938–39. *See also Chisom v. Roemer*, 501 U.S. 380, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) (Scalia, J., dissenting) (although dissenting from the majority's application of the VRA's "results test" to the election of state judges, Justice Scalia recognized that the "plain statement" rule should not apply).

## The VRA Also Does Not Violate Section Two of the Fourteenth Amendment

Implicit in Defendants' briefing is the argument that should the "plain statement" rule not apply, the "results test" under § 2 of the VRA would be an unconstitutional exercise of Congress's remedial powers. As explained by Justice Black in *Oregon v. Mitchell*,

[a]s broad as the congressional enforcement power is, it is not unlimited. Specifically, there are at least three limitations upon Congress' power to enforce the guarantees of the Civil War Amendments. First, Congress may not by legislation repeal other provisions of the Constitution. Second, the power granted to Congress was not intended to strip the States of their power to govern themselves or to convert our national government of enumerated powers into a central government of unrestrained authority over every inch of the whole Nation. Third, Congress may only "enforce" the provisions of the amendments and may do so only by "appropriate legislation."

400 U.S. at 266–67, 91 S.Ct. at 335–36.

Defendants argue that the VRA cannot apply to felon disenfranchisement, otherwise it would override § 2 of the Fourteenth Amendment. Section 2 of the Fourteenth Amendment provides for the election of federal legislative representatives, and reads as follows:

Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the

---

3. Because the judges were evenly divided, the decision in *Baker* does not have precedential value. The result was to uphold the decision of the district court, which had dismissed the plaintiffs' claims under Fed.R.Civ.P. 12(b)(6).

choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such States, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, *or other crime*, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

In *Richardson v. Ramirez*, 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974), the Supreme Court explained that the "other crime" language in § 2 provides constitutional recognition of the validity of felon disenfranchisement laws. Consequently, Defendants' argument is that Congress does not have the authority to illegalize felon disenfranchisement.

 As explained more fully in Section Four of this order, below, the Court agrees with Defendants that given § 2 of the Fourteenth Amendment, felon disenfranchisement laws cannot constitute *per se* violations of the Constitution. Viewed in isolation, it is constitutionally permissible to strip an individual of the right to vote based upon conviction for a felony. However, in spite of this facial validity, the Supreme Court has made clear that the states cannot use felon disenfranchisement as a tool to discriminate on the basis of race. *See Hunter v. Underwood*, 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985) (where original enactment was motivated by racial bias, facially neutral felon disenfranchisement law violates equal protection). It necessarily follows, then, that Congress also has the power to protect against discriminatory uses of felon disenfranchisement statutes through the VRA.

 Defendants also argue that if the "results test" of § 2 of the VRA were to be read so broadly as to encompass felon disenfranchisement statutes, then § 2 would cease to be only an enforcement mechanism. Instead, it would constitute an impermissible expansion of constitutional protections. This argument is based on the recent Supreme Court decision in *City of Boerne v. P.F. Flores,* ——. U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

In *Boerne,* the Court held that Congress exceeded its remedial authority under the Fourteenth Amendment in enacting the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb et seq. Under RFRA, a state law of general applicability that substantially burdened the free exercise of religion, violated federal law unless it could be justified by strict scrutiny analysis. The Supreme Court criticized this test as over-inclusive. The Court explained that the utilization of Congress's remedial power must exhibit, "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at ——, 117 S.Ct. at 2164. The Court concluded that by prohibiting state laws and policies that merely placed incidental burdens on the exercise of religion, Congress went beyond its goal of prohibiting discrimination on the basis of religion to create a new substantive right. *Id.* at ——, 117 S.Ct. at 2170.

The Supreme Court's decision in *Boerne* provides a recital of the Court's previous decisions approving numerous provisions of the VRA. In this discussion, the Court concluded that the VRA was narrowly tailored in comparison to RFRA. In so doing, the Court noted that the VRA, as previously approved, applied to specific geographic areas and subject matter that Congress found to be tainted by racial discrimination. *Id.* at —— – ——, 117 S.Ct. at 2170–71. Based on this discussion, one might wonder whether the Court's approval of the VRA is limited to areas where Congress has specifically found the presence of discrimination and need for intervention. If approval of the VRA were so limited, then § 2 of the VRA would not be able to reach subject matter, such as felon disenfranchisement laws, that have not been found by Congress to be perpetuated with discriminatory intent. As explained below, the Court rejects this interpretation on the basis that the VRA is sufficiently distinguishable from RFRA, even when not accompanied by specific congressional findings.

As a preliminary matter, the appropriate means–end balance is different in the context of race than religion. Although this country's history has not been free of invidious treatment of individuals on the basis of religion, discrimination on the basis of race is a far deeper problem that has been recurrent throughout our history. The remedies Congress created to address racial discrimination through the VRA were "unprecedented" and "deemed necessary given the ineffectiveness of the existing voting rights laws." *Boerne*, —— U.S. at ——, 117 S.Ct. at 2167.

A further distinction between § 2 of the VRA and RFRA is that the "results test" is tailored to fit the end goal of preventing discriminatory voting practices. Section 2 does not prohibit every voting test or restriction that effects racial minorities more than whites. If it did, then its breadth would be suspect, even given the extent of Congress's power in eliminating racial discrimination in voting. But instead, in order to satisfy the requirements of § 2, a plaintiff "must show a causal connection between the challenged voting practice and [a] prohibited discriminatory result." *Smith v. Salt River Proj. Ag. Improvement & Power Dist.*, 109 F.3d 586, 595 (9th Cir.1997). Read as such, the "results test" is properly limited to capturing racial discrimination when proof of intent is not accessible.

**Application of the VRA to Plaintiffs' Complaint**

■ Having determined that the VRA can apply to felon disenfranchisement laws, the question becomes whether Plaintiffs have alleged facts sufficient to state a claim for vote denial under the VRA. Section 2(b) of the VRA explains that the determination of whether a voting practice results in discriminatory treatment is to be "based on the totality of the circumstances." 42 U.S.C. § 1973(b).[4] The Senate Judiciary Committee Report, which accompanied the 1982 Amendments to the VRA, articulated several non-exclusive factors that may be taken into account:

1. the extent of any history of official discrimination in the state or political sub-division that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti–single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals; the extent to which members of the minority group have been elected to public office in the jurisdiction;

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

[7] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

[8] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

S.Rep. No. 97–417, 97th Cong.; 2d Sess. 28–29 (1982), *reprinted in* 1982 U.S.C.C.A.N. (vol.2) 177, 206–07. The Senate Report factors are mostly limited in relevance to claims for vote dilution, which is discussed below.

---

4. *Smith* makes clear that the totality of the circumstances approach applies to both vote denial and vote dilution claims. *Smith,* 109 F.3d at 596 n. 8.

*See Thornburg,* 478 U.S. at 45, 106 S.Ct. at 2763–64.

In determining whether Plaintiffs have alleged circumstances that could prove a causal relationship between Washington's felon disenfranchisement law and the denial of votes to racial minorities, precedent provides little guidance as to which factors should be considered salient. Consequently, the Court's assessment of Plaintiffs' complaint is focused on any circumstances alleged by Plaintiffs that would tend to establish that Washington's felon disenfranchisement law operates with social and historical conditions such that it causes individuals to be denied access to voting privileges on the basis of race.

On review of Plaintiffs' complaint, the Court concludes that Plaintiffs have alleged sufficient facts to state a claim for vote denial under the VRA. Among other things, Plaintiffs allege that African, Hispanic and Native Americans are targeted for prosecution of serious crimes and that they are overrepresented in prison populations. If true, Plaintiffs allegations may establish a causal connection between Washington's disenfranchisement scheme and the denial of voting rights to racial minorities.

**Plaintiffs' Complaint Should Not Be Dismissed Under *Wesley v. Collins***

■ The Court does not agree with Defendants that Plaintiffs are prohibited from stating a claim under the VRA because of policy considerations favoring disenfranchisement or the fact that Plaintiffs' own illegal behavior has played a role in their disenfranchisement. Defendants' argument in this context is based on the Sixth Circuit decision in *Wesley v. Collins,* 791 F.2d 1255 (6th Cir. 1986). Addressing a challenge to Tennessee's felon disenfranchisement law under the VRA, the panel in *Wesley* held that, while the plaintiffs had asserted various factors relevant to the totality of the circumstances review, the district court nevertheless correctly dismissed the plaintiffs' complaint under Fed.R.Civ.P. 12(b)(6). The judges in *Wesley* determined that the "chief," and therefore determinative, factor to consider in the case at hand is the important social goal justifying

the disenfranchisement of felons. *Id.* at 1261. The rationale for felon disenfranchisement is based upon John Locke's social contract theory. According to Locke's theory, as interpreted by the Second Circuit in *Green v. Board of Elections,* 380 F.2d 445, 451 (2d Cir.1967), those individuals who do not abide by society's rules cannot participate in their promulgation. By disenfranchising felons, states are thought to protect the sanctity of the ballot box, and therefore ensure the continued viability of the democratic process. The *Wesley* panel also noted that Tennessee's disenfranchisement law does not "deny any citizen, *ab initio,* the equal opportunity to participate in the political process .... Rather, only the commission of a preascertained, proscribed act warrants the state of Tennessee to foreclose a certain individual from the voting process." *Wesley,* 791 F.2d at 1262.

The Sixth Circuit's reasoning regarding the importance of the rationale behind felon disenfranchisement laws is not binding authority. Moreover, the decision conflicts with Ninth Circuit precedent. In *Dillenburg v. Kramer,* 469 F.2d 1222 (1972), the Ninth Circuit addressed the facial constitutionality of Washington's felon disenfranchisement law. *Dillenburg* did not discuss the racial implications of disenfranchisement statutes, and it predated the Supreme Court's decision in *Richardson,* which held that felon disenfranchisement laws are not *per se* unconstitutional. Thus, *Dillenburg* is not good law to the extent that it suggests that the disenfranchisement of felons, on its face, cannot pass constitutional muster. *Dillenburg* remains applicable, however, to the extent that the decision discusses the alleged justifications for felon disenfranchisement statutes. The panel in *Dillenburg* criticized the Locke's "purity of the ballot box" argument as overly academic and empirically unfounded. *Id.* at 1224–25. The decision also criticized Washington's law in particular, since it denies felons the right to vote based on the *possible* penalty for their offense, rather than their *actual* penalty or conduct.[5] On the basis of *Dillenburg,* therefore, consideration

---

5. Although the Washington statute defining infamous crimes has been amended since *Dillenburg,* it does not differ in this respect. *See* Wash. Rev.Code § 29.01.080.

of Washington's interest in disenfranchising felons is not conclusive as to whether the totality of the circumstances standard can be met.

■ The Court also does not agree with the judges in *Wesley* that Plaintiffs' misconduct prohibits them from claiming that Washington's felon disenfranchisement scheme operates so as to discriminate in the allocation of votes on the basis of race. This was not a bar to the plaintiffs claims in *Hunter v. Underwood,* and should play no different role in the case at hand. Implicit in Plaintiffs' Complaint is the argument that, had Plaintiffs Farrakhan, Shaheed, Price, Barrientes, Schaaf, and Briceno been white, they would have been substantially less likely to have lost the right to vote. Consequently, their claim is that race plays an impermissible role in the application of Washington's disenfranchisement scheme. The VRA provides Plaintiffs an avenue for relief from this type of discrimination.

### b. Vote Dilution

■ A separate matter from whether Plaintiffs can state a claim for vote denial is whether Plaintiffs have alleged sufficient facts to support a claim for vote dilution. Although the concept of vote dilution postdates that of vote denial, vote dilution cases have, in recent years, become the most common manner in which § 2 claims are raised. Vote dilution occurs when an election practice results in the dilution of minority voting strength. *See, e.g., Allen v. State Bd. of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). It "may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority." *Thornburg v. Gingles,* 478 U.S. at 46 n. 11, 106 S.Ct. at 2764 n. 11. Plaintiff Maxey[6] argues that because Washington's felon disenfranchisement law disproportionately removes racial minorities from the voting population, his voting strength, as a

member of the African American community, is diluted.

■ A claim for vote dilution, like a claim for vote denial, cannot be sustained solely upon an allegation of disparate impact. *See Smith,* 109 F.3d at 595. As explained above, the VRA requires plaintiffs to show a causal relationship between the challenged voting procedure and the discriminatory effect, based upon the totality of the circumstances. The eight Senate factors are especially relevant in the context of vote dilution claims. Three factors, in particular, have been identified by the Supreme Court as necessary in order to succeed on a claim of vote dilution. In *Thornburg,* Justice Brennan wrote that the following factors must be proven in order to establish vote dilution under the VRA: (1) the minority group in question must be sufficiently large and geographically compact to constitute a majority in a voting district;[7] (2) the group must be politically cohesive; and (3) the white majority group must vote sufficiently as a bloc so as to enable it to usually defeat the minority group's preferred candidate. 478 U.S. at 50–51, 106 S.Ct. at 2766–67.

Plaintiffs' Complaint and memorandum make conclusory statements about the existence of these factors, but nowhere do they allege any facts of, for instance, voter cohesiveness. Consequently, the Court agrees with Defendants that Plaintiffs have failed to state a claim under the VRA for vote dilution.

### 3. Claims Under the Fourteenth and Fifteenth Amendments

■ The Supreme Court's decision in *Richardson v. Ramirez,* 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974) made clear that felon disenfranchisement statutes were contemplated by the Fourteenth Amendment to the United States Constitution and, therefore, do not constitute *per se* violations of the constitutional right to vote. Plaintiffs nevertheless claim that Washington's law is

---

6. Plaintiffs Farrakhan, Shaheed, Price, Barrientes, Schaaf, and Briceno do not have standing to assert that their votes have been diluted since they are not registered to vote.

7. This factor may not be necessary where the disputed electoral practice is the product of intentional discrimination. *See Garza v. County of Los Angeles,* 918 F.2d 763, 770 (9th Cir.1990).

in violation of provisions of the federal Constitution because it was enacted with discriminatory intent. This type of claim is permissible under the reasoning in *Hunter v. Underwood, supra.*

■ In order to establish that Washington's felon disenfranchisement scheme violates the Fourteenth or Fifteenth Amendments, Plaintiffs must eventually prove that discrimination was a motivating factor in the enactment of the facially neutral law. *See Village of Arlington Heights v. Metropolitan Hous. Development Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). Although Plaintiffs' Complaint alleges improper motive, neither the Complaint nor the Court's own research reveal any circumstantial or direct evidence that would tend to support this claim. Consequently, Plaintiffs have also failed to adequately state a claim in this regard. *See Wesley,* 791 F.2d at 1262–63 (upholding lower court's dismissal of equal protection challenge to Tennessee disenfranchisement statute for failure to state a claim in light of the plaintiffs' inability to present evidence that "proved or inferred a discriminatory intent" on the part of the Tennessee legislature and stating that "the further discovery requested by plaintiffs would be in the nature of a fishing expedition for unspecified evidence.")

**4. The Remaining Constitutional Claims**

■ Plaintiffs also claim that Washington's felon disenfranchisement law violates free speech, double jeopardy and the prohibition of cruel and unusual punishment under the First, Fifth, and Eighth Amendments to the Constitution. In order to uphold these claims against Defendants' motion to dismiss, the Court would have to conclude that the same Constitution that recognizes felon disenfranchisement under § 2 of the Fourteenth Amendment also prohibits disenfranchisement under other amendments. The Court is not inclined to interpret the Constitution in this internally inconsistent manner or to determine that the Supreme Court's declaration of the facial validity of felon disenfranchisement laws in *Richardson v. Ramirez* was based only on the fortuity that the plaintiffs therein did not make their arguments

under different sections of the Constitution. While discussing the precedent leading up to its decision in *Richardson,* the Court wrote that "recently we have strongly suggested in dicta that exclusion of convicted felons from the franchise violates no constitutional provision." *Richardson,* 418 U.S. at 53, 94 S.Ct. at 2670. This language in *Richardson* suggests that the facial validity of felon disenfranchisement may be absolute. The Court concurs with this application to the case at hand.

The introduction to Plaintiffs' response memorandum states that "[t]his case is **about race.**" Plaintiffs' Responsive Memorandum of Authorities in Opposition to Defendant's Motion to Dismiss (Ct.Rec.72) (emphasis in original). The Court agrees. Consequently, Plaintiffs can only state a claim for relief based on the invalidity of Washington's felon disenfranchisement scheme to the extent that the law discriminates on the basis of race.

**5. Plaintiffs' Motion to Amend**

■ Plaintiffs have moved to amend their Complaint to include Bevan Maxey as a Plaintiff, and to allege a new cause of action to be stated by Plaintiff Farrakhan claiming that Washington's statute governing the restoration of felons' civil rights, Wash. Rev. Code 9.94A.220, fails to comport with the requirements of due process. Defendants object to Plaintiff Farrakhan's new claim based upon lack of standing.

According to Defendants, Plaintiff Farrakhan has yet to complete the terms of his sentence. *See* Affidavit of Phil Reynolds, attached as Exhibit One to Defendants' Reply Memorandum (Ct.Rec.78). Consequently, he is ineligible to apply for restoration of his civil rights and cannot attack the constitutionality of the restoration process. At oral argument, Plaintiffs contested that material issues of fact exist as to whether Plaintiff Farrakhan has completed his sentence. However, Plaintiffs have not come forward with any evidence that places Defendants' claims into doubt.

Although the Court must view a motion to amend with extreme liberality, amendment is

not proper if it would be futile. *See Kaplan v. Rose,* 49 F.3d 1363, 1370 (9th Cir.1994). The Court concludes, from the record at hand, that Plaintiffs' motion to amend, as to the substantive due process claim, cannot be granted on the basis of lack of standing.[8] Because Plaintiff Farrakhan is not yet eligible to seek reinstatement of his voting rights, his alleged injury is too speculative to support a cause of action challenging the constitutionality of the reinstatement provisions. *See, e.g., Texas Supporters of Workers World Party Presidential Candidates v. Strake,* 511 F.Supp. 149 (S.D.Tex.1981) (plaintiff exfelons did not have standing to assert cause of action based on denial of pardons where they had not formally applied for pardons). Consequently, Plaintiffs' Motion to Amend is denied, except to the extent that Bevan Maxey shall be added as a party of record, albeit to a dismissed claim, for the purposes of appeal.

Based upon the foregoing analysis, **IT IS HEREBY ORDERED:**

1. Defendants' Motion to Dismiss **(Ct. Rec.53)** is **GRANTED in part and DENIED in part.** Defendants' motion is denied as to Plaintiffs' vote denial claim. Plaintiffs' vote dilution claim and all of Plaintiffs' constitutional claims are dismissed. The parties are instructed to note that only Farrakhan, Shaheed, Price, Barrientes, Schaaf, and Briceno remain as plaintiffs in this action.

2. Plaintiffs' Motion for Leave to Amend **(Ct.Rec.66)** is **GRANTED in part and DENIED in part.** Plaintiffs' motion to add Bevan Maxey is granted, *nunc pro tunc,* for the purposes of appeal. Plaintiffs' motion to add a due process claim is denied.

**IT IS SO ORDERED.** The District Court Executive is directed to enter this order and to provide copies to counsel.

---

8. If Plaintiff Farrakhan does hold evidence which puts the status of his sentence into doubt, he may include this information in a motion for reconsideration.