MARCUS, Circuit Judge:
*1207 Appellants Rick Scott, in his official capacity as Governor of the State of Florida, and the other three members of Florida's Executive Clemency Board (Pam Bondi, Adam H. Putnam, and Jimmy Patronis) (collectively, the "State Executive Clemency Board") have appealed from the district court's orders entered in favor of appellees James Michael Hand and eight other convicted felons who have completed their sentences and seek to regain their voting rights in Florida. In the underlying lawsuit, the appellees facially challenged, under the Fourteenth Amendment's Equal Protection Clause and the First Amendment, Florida's scheme of voter reenfranchisement for convicted felons, claiming that the State Executive Clemency Board exercised "unbridled discretion" to deny voter reenfranchisement in the absence of any articulable standards. The district court granted summary judgment in favor of appellees, entering a declaratory judgment, permanently enjoining the State Executive Clemency Board from "enforcing the current unconstitutional vote-restoration scheme" and "ending all vote-restoration processes," and commanding the State Executive Clemency Board to "promulgate specific and neutral criteria to direct vote-restoration decisions" along with "meaningful, specific, and expeditious time constraints" on or before April 26, 2018.
Currently before this Court is the State Executive Clemency Board's time-sensitive Motion for Stay Pending Appeal, seeking provisionally to stay the district court's injunctions, until this appeal is heard. The parties agree that four factors are relevant to granting a stay: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Nken v. Holder, 556 U.S. 418, 426, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) (quoting Hilton v. Braunskill, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987) ). The first two factors are the "most critical." Id. at 434, 129 S.Ct. 1749. We are satisfied that the State Executive Clemency Board has made a sufficient showing under Nken to warrant a stay, and, accordingly, we stay the district court's entry of injunctive relief until this appeal is resolved by a panel of the Court. The Fourteenth Amendment expressly empowers the states to abridge a convicted felon's right to vote. U.S. Const. amend. XIV, § 2. Binding precedent holds that the Governor has broad discretion to grant and deny clemency, even when the applicable regime lacks any standards. And although a reenfranchisement scheme could violate equal protection if it had both the purpose and effect of invidious discrimination, appellees have not alleged-let alone established as undisputed facts-that Florida's scheme has a discriminatory purpose or effect. And the First Amendment provides no additional protection of the right to vote.
*1208 I.
First, the State Executive Clemency Board has shown it will likely succeed on the merits of the Equal Protection claim. The appellees have claimed that Florida's "standardless" voter reenfranchisement regime facially violates the Equal Protection Clause of the Fourteenth Amendment. They do not say that the defendants actually discriminated against any of them on the basis of race or any other invidious grounds. Rather, the heart of their claim is that the State Executive Clemency Board's unbounded discretion will yield an unacceptable "risk" of unlawful discrimination.
For starters, we are bound to follow Supreme Court precedent in Beacham. Beacham v. Braterman, 300 F.Supp. 182 (S.D. Fla. 1969), aff'd 396 U.S. 12, 90 S.Ct. 153, 24 L.Ed.2d 11 (1969). The case stands for the proposition that Florida did not violate the Equal Protection or Due Process Clauses of the Fourteenth Amendment in denying a petitioner's application for pardon and reenfranchisement, even though the Governor and selected cabinet officers did so in the absence of any articulable or detailed standards. Id. at 184. It establishes the broad discretion of the executive to carry out a standardless clemency regime.
In Beacham, a convicted felon in Florida challenged the refusal to grant him a pardon and the concomitant restoration of his civil rights, including the right to register to vote. Id. at 182-83. He claimed that since there were no "established specific standards to be applied to the consideration of petitions for pardon," the plenary denial of that right violated both the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment. Id. at 183. A three-judge district court panel squarely rejected the claim, holding that state officials may constitutionally exclude from the franchise convicted felons and that Florida's standardless scheme did not violate the Fourteenth Amendment. The court reasoned that the discretionary pardon power, which included within its ambit the restoration of civil rights, "has long been recognized as the peculiar right of the executive branch of government," and that the exercise of that executive power was free from judicial control. Id. at 184. Accordingly the district court denied the relief sought in the complaint and dismissed the cause. The Supreme Court, in a summary decision, affirmed the holding of the three-judge district court. 396 U.S. 12, 90 S.Ct. 153.
The district court concluded that, "[u]nlike a fine wine, [ Beacham ] has not aged well," but it remains binding precedent that cannot, as the district court suggested, simply be ignored. We are bound by the Supreme Court's summary determinations. See Picou v. Gillum, 874 F.2d 1519, 1521 n.3 (11th Cir. 1989) ("The Supreme Court's summary dispositions are of course entitled to full precedential respect."). A summary disposition affirms the judgment and that which is essential to the judgment. Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 182, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) ("[T]he precedential effect of a summary affirmance can extend no farther than the precise issues presented and necessarily decided...." (quotations omitted) ); see also id. at 182-83, 99 S.Ct. 983 ("A summary disposition affirms only the judgment of the court below, and no more may be read into our action than was essential to sustain that judgment." (citations omitted) ). The Supreme Court has since cited Beacham approvingly, observing, "we have summarily affirmed two decisions of three-judge District Courts rejecting constitutional challenges to state laws disenfranchising convicted felons."
*1209 Richardson v. Ramirez, 418 U.S. 24, 53, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974) (citing Beacham, 300 F.Supp. 182, aff'd 396 U.S. 12, 90 S.Ct. 153 ).
Other precedents confirm the broad discretion of the executive to grant and deny clemency. In Connecticut Board of Pardons v. Dumschat, 452 U.S. 458, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981), the Supreme Court held that a state was entitled to vest the Board of Pardons with "unfettered discretion" to grant pardons based on "purely subjective evaluations ... by those entrusted with the decision," leaving inmates with only a "unilateral hope" for pardon. Id. at 464-66, 101 S.Ct. 2460. Still again, in Ohio Adult Parole Authority v. Woodard, 523 U.S. 272, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998), the Supreme Court reaffirmed that, because clemency decisions are "matter[s] of grace" by which the executive may consider "a wide range of factors not comprehended by earlier judicial proceedings and sentencing determinations," the state could allocate pardons in a purely discretionary manner without procedural safeguards under the Due Process Clause. Id. at 281, 118 S.Ct. 1244. Finally, in Smith v. Snow, 722 F.2d 630 (11th Cir. 1983), a panel of this Court addressed Due Process and Eighth Amendment claims attacking Georgia's purely discretionary pardon regime. First, we ruled that Smith's Due Process claim was foreclosed by Dumschat. Id. at 631-32. Next, the Court held that the failure of Smith's Eighth Amendment claim necessarily followed. Id. at 632. If a state pardon regime need not be hemmed in by procedural safeguards, it cannot be attacked for its purely discretionary nature. Id. ("If one has no right to procedures, the purpose of which is to prevent arbitrariness and curb discretion, then one clearly has no right to challenge the fact that the decision is discretionary.").
Perhaps of even greater importance, we are obliged to recognize that § 2 of the Fourteenth Amendment expressly empowers the states to abridge a convicted felon's right to vote. It reads this way:
Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.
U.S. Const. amend., XIV § 2 (emphasis added). And the Supreme Court has explicitly cited the text of § 2 as it has recognized the power of the state to bar felons from voting. Thus, for example, it has held that "the exclusion of felons from the vote has an affirmative sanction in § 2 of the Fourteenth Amendment." Richardson, 418 U.S. at 54, 94 S.Ct. 2655.
It is also true, however, that since Beacham, the Supreme Court has recognized that, at least in limited circumstances, a state's pardon power may be cabined by judicial decree. Thus, in Hunter, the Supreme Court made it clear that a state's method for reenfranchising a convicted felon would violate equal protection if the scheme had both the purpose and effect of invidious discrimination. Justice Rehnquist wrote for a unanimous Court:
*1210 Presented with a neutral state law that produces disproportionate effects along racial lines, the Court of Appeals was correct in applying the approach of Arlington Heights to determine whether the law violates the Equal Protection Clause of the Fourteenth Amendment: "[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact.... Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."
Hunter v. Underwood, 471 U.S. 222, 227-28, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985) (alterations in original) (quoting Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) ); see also Osborne v. Folmar, 735 F.2d 1316, 1317 (11th Cir. 1984).
The problem for the appellees in this case, however, is that they have not shown (nor have they even claimed) that Florida's constitutional and statutory scheme had as its purpose the intent to discriminate on account of, say, race, national origin, or some other insular classification; or that it had the effect of a disparate impact on an insular minority. All we have is the assertion by the appellees and a statement by the district court that there is a real "risk" of disparate treatment and discrimination, precisely because the Florida regime is standardless. Such a risk of discrimination, however, is likely insufficient under Beacham and Hunter.
Moreover, we have rejected, en banc, that Florida's felon-disenfranchisement regime was enacted with a discriminatory purpose, and the appellees have not offered anything suggesting otherwise. See Johnson v. Governor of State of Fla., 405 F.3d 1214, 1223-27 (11th Cir. 2005) (en banc). In Johnson, we examined whether Florida's vote-restoration regime, either historically or as revised over time, had "racial discrimination [as] a substantial or motivating factor" and determined that it did not. Id. at 1223. We found no "contemporaneous evidence showing that racial discrimination motivated" the initial disenfranchisement provision, but even assuming that it had been so motivated, we held that "Florida's felon disenfranchisement provision is constitutional because it was substantively altered and reenacted in 1968 in the absence of any evidence of racial bias." Id. at 1223, 1225. All the appellees have offered in this case is a "risk" that standardless determinations "could" lead to impermissible discrimination; that is not enough to show a discriminatory purpose or effect. The State Executive Clemency Board has made a strong showing it is likely to succeed on appellees' equal protection claim.
II.
We also conclude that the State Executive Clemency Board will likely succeed on the merits of the First Amendment claim. The appellees allege that Florida's felon-reenfranchisement regime facially violates the First Amendment because it vests the Executive Clemency Board with "unfettered discretion" to engage in a "standard-less process of arbitrary and discriminatory decision-making, which is untethered to any laws, rules, standards, criteria, or constraints of any kind, and unconstrained by any definite time limits," thereby abridging their right to vote and creating an impermissible risk of "arbitrary, biased, and/or discriminatory treatment." [Plaintiffs' Mot. for Summ. J. at 16, 18] The appellees expressly disclaim reliance on any anecdotal examples of discrimination and offer nothing suggesting that any of them were the victims of viewpoint discrimination, asserting that "[f]acial attacks on the discretion granted a decisionmaker are not dependent on the facts surrounding *1211 any particular permit decision," since "[t]he success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing him from doing so." [Appellees' Resp. to Mot. for Stay at 10] The appellees, therefore, suggest that "actual discrimination need not be proven." [Id. at 12]
Their theory likely fails for at least three reasons. First, our case law establishes that the First Amendment affords no greater voting-rights protection beyond that already ensured by the Fourteenth Amendment. Because a standardless pardon process, without something more, does not violate the Fourteenth Amendment, it follows that it does not run afoul of the First Amendment. In the second place, Florida's power to disenfranchise voters is expressly sanctioned by § 2 of the Fourteenth Amendment. And finally, no First Amendment challenge to a felon-disenfranchisement scheme has ever been successful.
It is well established in this Circuit that the First Amendment provides no greater protection for voting rights than is otherwise found in the Fourteenth Amendment. In Burton v. City of Belle Glade, 178 F.3d 1175 (11th Cir. 1999), the plaintiffs alleged that the City of Belle Glade's failure to annex their housing project deprived them of the right to vote in violation of the First and Fourteenth Amendments. Id. at 1183. After rejecting the plaintiffs' Fourteenth Amendment claim, the Court disposed of plaintiffs' First Amendment contention, holding that "since the First and Thirteenth Amendments afford no greater protection for voting rights claims than that already provided by the Fourteenth and Fifteenth Amendments, we conclude that the district court did not err in dismissing these claims." Id. at 1188 n.9 (citations omitted). Additionally, in Cook v. Randolph County, 573 F.3d 1143 (11th Cir. 2009), Cook contended that the County Board of Registrars' attempt to change his voting registration infringed his right to vote under the First and Fourteenth Amendments. Id. at 1148. There, a panel of this Court dismissed Cook's First Amendment claim, holding still again that "[t]he First and Thirteenth Amendments afford no greater protection for voting rights claims than that already provided by the Fourteenth and Fifteenth Amendments." Id. at 1152 n.4 (quoting Burton, 178 F.3d at 1188 n.9 ); see also Irby v. Virginia State Bd. of Elections, 889 F.2d 1352, 1359 (4th Cir. 1989) ("Having found no violations of the Equal Protection Clause and the Fifteenth Amendment, we likewise conclude that plaintiffs' First and Thirteenth Amendment claims must fail. In voting rights cases, the protections of the First and Thirteenth Amendments do not in any event extend beyond those more directly, and perhaps only, provided by the fourteenth and fifteenth amendments.") (internal quotation marks omitted) ).
Because Florida likely has established that its felon-reenfranchisement regime does not violate the Equal Protection Clause of the Fourteenth Amendment, it is unlikely indeed that the same exercise of the pardon power violates the First Amendment. Since a standardless reenfranchisement scheme, without more, does not state a claim for an Equal Protection violation based on invidious discrimination, it likely follows that a standardless scheme, without more, cannot establish a First Amendment violation based on viewpoint discrimination. While a discretionary felon-reenfranchisement scheme that was facially or intentionally designed to discriminate based on viewpoint-say, for example, *1212 by barring Democrats, Republicans, or socialists from reenfranchisement on account of their political affiliation-might violate the First Amendment, cf. Hunter, 471 U.S. at 227-28, 105 S.Ct. 1916 ; Shepherd v. Trevino, 575 F.2d 1110, 1114 (5th Cir. 1978), no such showing has been made in this case. Indeed, the district court, having said nothing about invidious purpose, could discern only that there was a "risk" that a standardless regime could possibly yield viewpoint discrimination. Thus, even if the First Amendment could be employed in this case in lieu of the Fourteenth-and that is not an easy argument to sustain in the face of controlling case law-something more than risk likely would have to be shown.
In the wake of Beacham, Dumschat, Woodard, and Smith, a purely discretionary clemency regime does not, without something more, violate the Fourteenth Amendment. As we see it, a constitutional challenge arising under the First Amendment but asserting the same basic claim-that standardless clemency regimes create an unacceptable risk of discriminatory determinations-is unlikely to yield a different result. In other words, the appellees likely cannot succeed by bringing the same challenge using only a different label or nomenclature.
It's also pretty clear that, in a reenfranchisement case, the specific language of the Fourteenth Amendment controls over the First Amendment's more general terms. Cf. Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (holding that the Fourth Amendment governed rather than the Fourteenth Amendment because the Fourth Amendment's "explicit text[ ]" addressed the precise question at issue as opposed to the Fourteenth Amendment's "more generalized notion"); Cty. of Sacramento v. Lewis, 523 U.S. 833, 843, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (a general constitutional provision applies only if the matter presented is not "covered by" a more specific provision); West v. Davis, 767 F.3d 1063, 1067 (11th Cir. 2014) ("[W]hen a specific provision of the Constitution is allegedly infringed, a court must decide the claim in accordance with the terms of that provision rather than under the more general rubric of substantive due process."). Thus, just as "section 2 of the fourteenth amendment blunts the full force of section 1's equal protection clause with respect to the voting rights of felons," Shepherd, 575 F.2d at 1114, § 2 likewise blunts the First Amendment's application here.
Moreover, although First Amendment attacks on discretionary pardon schemes have been few and far between, the Supreme Court "ha[s] strongly suggested in dicta that exclusion of convicted felons from the franchise violates no constitutional provision." Ramirez, 418 U.S. at 53, 94 S.Ct. 2655 (emphasis added). And every First Amendment challenge to a discretionary vote-restoration regime we've found has been summarily rebuffed. See, e.g., Kronlund v. Honstein, 327 F.Supp. 71, 73 (N.D. Ga. 1971) ; Farrakhan v. Locke, 987 F.Supp. 1304, 1314 (E.D. Wash. 1997) ; Johnson v. Bush, 214 F.Supp.2d 1333, 1338 (S.D. Fla. 2002) (King, J.), aff'd sub nom. Johnson, 405 F.3d at 1214 ; Hayden v. Pataki, No. 00 Civ. 8586 (LMM), 2004 WL 1335921, at *6 (S.D.N.Y. June 14, 2004) ; Howard v. Gilmore, 205 F.3d 1333 (unpublished table decision), 2000 WL 203984 at *1 (4th Cir. 2000).
Finally, the First Amendment cases cited by the appellees appear inapposite to a reenfranchisement case. Those cases established the longstanding and important but (for our purposes) unremarkable point that a state cannot vest officials with unlimited discretion to grant or deny licenses *1213 as a condition of engaging in protected First Amendment activity. See, e.g., Forsyth Cty. v. Nationalist Movement, 505 U.S. 123, 130-33, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) ; City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 757-58, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). Thus, for instance, Forsyth County discussed an ordinance that granted officials with boundless authority to authorize or forbid, and assess fees on, "public speaking, parades, or assemblies in the archetype of a traditional public forum," which the Supreme Court deemed a "prior restraint on speech." 505 U.S. at 130, 112 S.Ct. 2395 (quotation omitted). Likewise, City of Lakewood involved a licensing statute that reposed in the government the unbridled power to permit or deny the placement of newspaper-dispensing devices on public sidewalks. 486 U.S. at 753, 108 S.Ct. 2138. There too, the Court struck down the statute as a "prior restraint." Id. at 757, 108 S.Ct. 2138. However, this precedent does not bear directly on the matters presented by this case. Indeed, none of the cited cases involved voting rights or even mentioned the First Amendment's interaction with the states' broad authority expressly grounded in § 2 of the Fourteenth Amendment to disenfranchise felons and grant discretionary clemency.
The long and short of it is that the State Executive Clemency Board is likely to succeed as well on the merits of the appellees' facial First Amendment claim.
III.
As a separate matter, Florida is also likely to succeed on the merits because there are serious and substantial problems that inhere in the remedies the district court has chosen-injunctions commanding that the State Executive Clemency Board cannot refuse to reenfranchise felons and that the Governor and his cabinet must fashion out of whole cloth new standards by April 26, 2018. In particular, the injunctions flatly prohibit the State Executive Clemency Board "from ending all vote-restoration processes" for convicted felons. The district court crafted the permanent injunctions this way:
Defendants are PERMANENTLY ENJOINED from enforcing the current unconstitutional vote-restoration scheme. Defendants are also PERMANENTLY ENJOINED from ending all vote-restoration processes. On or before April 26, 2018, Defendants shall promulgate specific and neutral criteria to direct vote-restoration decisions in accordance with this Order. On or before April 26, 2018, Defendants shall also promulgate meaningful, specific, and expeditious time constraints in accordance with this Order. Defendants shall file with this Court its modified rules on or before April 26, 2018.
However, as we've noted, § 2 of the Fourteenth Amendment expressly provides for reduction of representation to the states if they deny or abridge the right to vote "except for participation in rebellion, or other crime." U.S. Const. amend. XIV, § 2. Indeed, the district court acknowledged that "[i]t is well-settled that a state can disenfranchise convicted felons under Section Two of the Fourteenth Amendment." And it correctly explained that a state may do so "permanently." Nonetheless, after concluding only that the Florida regime posed a risk of discrimination among applicants, the district court enjoined Florida from exercising the authority that § 2 clearly establishes because the district court concluded that the Florida constitution "presumes a restoration process exists" only because it "bars [any] felon[ ] from voting 'until restoration of civil rights.' " Fla. Const. art. VI, § 4 (a) (emphasis added by district court). But the *1214 district court cannot enjoin Florida to follow the district court's interpretation of Florida's own constitution. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). And we can find no case law even remotely suggesting that the state cannot bar all felons (without drawing any distinctions) from being eligible for reenfranchisement.
What's more, the permanent injunctions entered by the district court command the Governor and three cabinet members to promulgate new standards no later than April 26. These standards must determine when and how to exercise the Governor's power in order to reenfranchise convicted felons. As a court sitting in equity, that seems to us to be a tall order, even assuming the district court had the authority to enter this command in the first place. After all, there are a multitude of considerations for them to study, including but not limited to whether the Clemency Board should adopt mathematical criteria, how "specific and neutral" the criteria should be, whether arrests or convictions for certain kinds of misdemeanor or felony offenses (and there are many) should be either relevant or categorically disqualifying, the kinds of rules previous Florida officials and other states have put in place and how they have worked in practice, and whether the Board should create a newly bifurcated system for processing applications involving civil rights other than voting rights, such as the right to serve on a jury or to hold or run for public office.
Thus, on this ground as well, the State Executive Clemency Board has demonstrated a substantial likelihood of success on the merits.
IV.
Having determined that the State Executive Clemency Board has made a strong showing on the merits as to all of the appellees' claims, we further believe the Clemency Board likely has met its burden overall.
The State Executive Clemency Board likely has shown irreparable harm absent a stay. Beyond whether the injunction directs the State Executive Clemency Board to do something it is by no means clear the court can compel it to do, the State Executive Clemency Board would be harmed if it could not apply its own laws to grant clemency to eligible applicants now, even if it might later be able to afford these applicants clemency pursuant to a system not yet in place and not of the State Executive Clemency Board's choosing. See Maryland v. King, 567 U.S. 1301, 1301, 133 S.Ct. 1, 183 L.Ed.2d 667 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (quotations omitted) ).
The State Executive Clemency Board also has a substantial interest in avoiding chaos and uncertainty in its election procedures, and likely should not be forced to employ a rushed decision-making process created on an artificial deadline now, just because a more thorough decision-making process could be employed later. We are reluctant to upset the system now in place-particularly since the district court order creates so truncated a schedule-when there is a good chance the district court's order may be overturned, and the system would need to be changed still again, potentially re-disenfranchising those who have been reenfranchised pursuant to the district court's injunction. Put another way, there is wisdom in preserving the status quo ante until a panel of this Court, on an expedited basis, has had an opportunity on full briefing to come to grips with the many constitutional and equitable issues *1215 that have been raised. To this end, in a separate order, this Court has directed the Clerk to accelerate the briefing schedule and oral argument in the appeal.
As for injury to the appellees, they surely have an interest in regaining their voting rights sooner rather than later, especially since some of them apparently have been waiting a long time to have their rights restored. By the same token, however, since the injunctive relief fashioned by the district court permanently enjoins the defendants from enforcing the current voter-restoration scheme, in the absence of a stay the Governor is barred from reenfranchising anyone (including any of the nine appellees). Nor have the appellees explained why they've waited until now to sue over these rights, nor, finally, have they shown that denying a stay will necessarily increase the speed with which their voting rights may be restored, considering that this Court has accelerated briefing of the merits and oral argument so that the matter can be resolved quickly.
Moreover, a stay of the district court's order would serve any number of substantial public interests: allowing the continued restoration of voting rights to convicted felons while the suit progresses; ensuring proper consultation and careful deliberation before overhauling the State Executive Clemency Board's voter-eligibility requirements; and preserving autonomy of the State Executive Clemency Board's exercise of its power to pardon.
In short, the State Executive Clemency Board has met its burden under Nken. Accordingly, the appellants' motion is GRANTED, and the injunctions entered by the district court are STAYED pending the resolution of this appeal.
The Clerk is directed to treat any motion for reconsideration of this order as a non-emergency matter.