IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

WILLIE JAMES SIMPSON,

     Appellant,

 v.

                                             Case No. 5D23-0128
                                             LT Case No. 16-2020-CF-004768A

STATE OF FLORIDA,

     Appellee.
_____/

Opinion filed August 4, 2023

Appeal from the Circuit Court
for Duval County,
Tatiana Salvador, Judge.

Jessica J. Yeary, Public Defender,
and Victor D. Holder, Assistant Public
Defender, Tallahassee, for Appellant.

Ashley Moody, Attorney General, and
Adam B. Wilson, Assistant Attorney
General, Tallahassee, for Appellee.

JAY, J.

     Following a bifurcated trial, Appellant was convicted by a jury of his

peers of attempted second-degree murder and possession of a firearm by a

convicted felon. The trial court designated Appellant both a prison releasee

reoffender and habitual violent felony offender and sentenced him to concurrent terms of thirty years in prison on each count, including the applicable minimum mandatory sentences. Appellant appeals his judgment and sentence. We have jurisdiction. *See* Art. V, § 4(b)(1), Fla. Const.; Fla. R. App. P. 9.030(b)(1)(A).

We affirm in all respects. Appellant's request that this Court certify a question to the Florida Supreme Court as an issue of great public importance is denied.

AFFIRMED.

SOUD, J., concurs with opinion, in which Jay, J., joins.
PRATT, J., concurs with opinion, in which Jay, J., joins.

SOUD, J., concurring.

I concur entirely with this Court's affirmance and write to address Simpson's claim of a Sixth Amendment right to a jury of twelve persons.

I.

Appellant argues that a six-person jury violates his right to trial by jury secured by the Sixth Amendment to the United States Constitution.[1] In support of his argument, Appellant traces two concurring opinions from the First District that question the United States Supreme Court's opinion in *Williams v. Florida*, 399 U.S. 78 (1970), which upheld the constitutionality of Florida's use of six-person juries in non-capital cases. *See Lessard v. State*, 232 So. 3d 13, 17 (Fla. 1st DCA 2017) (Makar, J., concurring) (questioning

---

[1] Appellant also argues in this appeal that a six-person jury violates our *state* constitution's guarantee of an impartial jury. This claim is wholly without merit. Of course, "[i]n all criminal prosecutions the accused shall . . . have the right . . . to have a speedy and public trial by impartial jury in the county where the crime was committed." Art. I, § 16(a), Fla. Const. Further, "[t]he right of trial by jury shall be secure to all and remain inviolate. The qualifications and the number of jurors, not fewer than six, shall be fixed by law." *Id.* at Art. I, § 22. With this constitutional prerogative, the Florida legislature long ago provided, "[t]welve persons shall constitute a jury to try all capital cases, and six persons shall constitute a jury to try all other criminal cases." § 913.10, Fla. Stat.; *see also* Fla. R. Crim. P. 3.270. It is frivolous to suggest that what is expressly permitted by Article I, section 22—"not fewer than six" jurors—violates Article I, section 16(a). *See Gibson v. State*, 16 Fla. 291, 300 (1877) ("Under [the Florida Constitution] a jury composed of six persons is a constitutional jury.").

3

*Williams* but recognizing in 2017 that a claimed Sixth Amendment right to a twelve-person jury was a "non-starter," as "[n]o federal constitutional impediment stands in the way of a six-person jury in a state criminal court"); *Phillips v. State*, 316 So. 3d 779, 787–88 (Fla. 1st DCA 2021) (Makar, J., concurring) ("updat[ing his] observation" in 2021 and concluding that *Williams* "may be ripe for re-evaluation" in light of *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020)).[2]

This crescendoing critique of *Williams* was joined by a concurring opinion from the Fourth District in *Guzman v. State*, 350 So. 3d 72, 75 (Fla. 4th DCA 2022) (Gross, J., concurring), which noted what was believed to be "a classic example of how the law navigates the *shifting sands* of constitutional analysis." (emphasis added). I disagree. This quote actually demonstrates a primary flaw of the criticism of *Williams*. Rather than on "shifting sands," proper constitutional analysis can only legitimately be founded upon the firmest of bedrock—a vast foundation of immovable and unchanging stone that is hewn only by the text of the Constitution itself.

---

[2] *Ramos* held that the Constitution requires juries to return a unanimous verdict in criminal cases. This is hardly new ground in Florida. It has long been true that "[a]s a state constitutional matter, a criminal conviction requires a unanimous verdict in Florida. This has been an 'inviolate tenet of Florida jurisprudence since the State was created.'" *Robinson v. State*, 881 So. 2d 29, 30 (Fla. 1st DCA 2004) (citation omitted).

4

II.

Florida's use of six jurors does not violate the right to trial by jury guaranteed by the Sixth Amendment. *See Williams*, 399 U.S. at 103.[3] This has been the settled conclusion of binding legal precedent for **fifty-three years**. However, this old issue has found new energy in light of Justice Gorsuch's withering rebuke of *Williams* in his recent dissenting opinion in *Khorrami v. Arizona*, 143 S. Ct. 22 (2022).[4]

A.

Relevant to the case *sub judice*, the Sixth Amendment secures:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . .

Amend. VI, U.S. Const. The Supreme Court has determined that the Fourteenth Amendment guarantees a right to trial by jury in all criminal cases in state courts that—were they to be tried in a federal court—would come

---

[3] *See also Brown v. State,* 359 So. 3d 408, 410 n.1 (Fla. 1st DCA 2023) (As Judge Tanenbaum aptly observed, "[w]e reject without further discussion Brown's unpreserved and nearly frivolous contention (based on a misleading characterization of *Ramos v. Louisiana*) that he was entitled to a twelve-member jury on these charges.").

[4] No other Justice joined Justice Gorsuch's dissent, including none of those who concurred with the Court's opinion or judgment in *Ramos*.

within the Sixth Amendment's guarantee. *Duncan v. Louisiana*, 391 U.S. 145 (1968).

Thereafter, in *Williams*, the Court held that Florida law providing for a six-person jury in a non-capital robbery trial, rather than a twelve-person jury, did not violate the Sixth Amendment. *Williams*, 399 U.S. at 86. The Court noted that how the common law settled on the number of twelve persons to constitute a jury is unclear. Whether the number twelve was born from the size of "the presentment jury from the hundred, from which the petit jury developed[,]" or the "more fanciful" reasons founded "on little more than mystical or superstitious insights[,]" or from that presented by Lord Coke as based "in holy writ" (such as twelve apostles, twelve stones or twelve tribes), the particular feature of twelve jurors, the Court concluded, was a "historical accident . . . ." *Williams*, 399 U.S. at 87–89. *Williams* held that this "accidental feature of the jury" (i.e., twelve jurors) was not "immutably codified into our Constitution." *Id.* at 90, 100. "Justice White's opinion for the Court in *Williams* looked to the underlying purpose of the jury-trial right, which it identified as interposing a jury of the defendant's peers to protect against oppression by a 'corrupt or overzealous prosecutor' or a 'compliant, biased, or eccentric judge.'" *Ramos*, 140 S. Ct. at 1434 (Alito, J., dissenting) (citations and internal quotation marks omitted).

B.

At the outset, it is noteworthy that the text of the Sixth Amendment requires "in all criminal prosecutions" a trial that is (1) speedy, (2) public, (3) before an impartial jury, and (4) said jury being of the State and district where the crime was committed. Thus, the text provides the only constitutionally prescribed requirements for a jury to decide a criminal trial—that is, the jury be impartial and from the State and district where the crime was committed. The text of the Sixth Amendment provides no other express requirement— including no requirement as to the exact number of jurors. Yet, the question is raised: what number of jurors is required to constitute a jury guaranteed by the Sixth Amendment?

In dissenting from the denial of certiorari review, Justice Gorsuch opined in *Khorrami* that the Sixth Amendment guarantee of a trial by an impartial jury constitutionalizes the inflexible requirement of twelve jurors because a twelve-person jury was well-established in the common law.[5]

---

[5] For Justice Gorsuch, the twelve-person jury carries not only a constitutional dimension but also, apparently, a quasi-moral connotation. Justice Gorsuch opines, *Williams* "impairs both the *integrity* of the American criminal justice system and the liberties of those who come before our Nation's courts." *Khorrami*, 143 S. Ct. at 23 (Gorsuch, J., dissenting) (emphasis added). I could not more strongly disagree with any notion that the *integrity* of the verdicts of Florida juries is impaired because there are six members.

As an initial matter, as Justice Gorsuch noted in his dissent (citing Sir William Blackstone, James Wilson, and others), it is true the concept of trial by jury at common law was long understood to include twelve persons. The *Williams* Court, too, acknowledged that "sometime in the 14th century the size of the jury at common law came to be fixed generally at [twelve] . . . ." *Williams*, 399 U.S. at 89. But that is not the issue. The question is "whether that particular feature must be accepted as a *sine qua non* of the jury trial guaranteed by the Constitution." *Id.* at 91 n.27.

It is likewise true that "[t]he interpretation of the Constitution of the United States is necessarily influenced by the fact that its provisions are framed in the language of the English common law, and are to be read in the light of its history." *Khorrami*, 143 S. Ct. at 23 (Gorsuch, J., dissenting) (quoting *Smith v. Alabama*, 124 U.S. 465 (1888)). However, to insist that a jury under the Sixth Amendment requires exactly twelve members goes beyond the common law *influencing* the interpretation of the Sixth Amendment*;* rather, it allows the common law to overcome the language chosen in the amendment that was born in the time and from the circumstances of its writing.

When interpreting the United States Constitution, a proper determination of the original public meaning of the Sixth Amendment is not

necessarily the product of an exercise that begins and ends with references to the common law developed by judges in England over the centuries. As elucidated by Justice Alito, when analyzing a federal statute:

> [W]hat matters in the end is[:] How would the terms of a statute have been understood by ordinary people at the time of enactment?
>
> Justice Scalia was perfectly clear on this point. The words of a law, he insisted, "mean *what they conveyed to reasonable people at the time.*"
>
> Leading proponents of Justice Scalia's school of textualism have expounded on this principle and explained that it is grounded on an understanding of the way language works. As Dean John F. Manning explains, "the meaning of language depends on the way a linguistic community uses words and phrases in context." "[O]ne can make sense of others' communications only by placing them in their appropriate social and linguistic context," and this is no less true of statutes than any other verbal communications. "[S]tatutes convey meaning only because members of a relevant linguistic community apply shared background conventions for understanding how particular words are used in particular contexts." **Therefore, judges should ascribe to the words of a statute "what a reasonable person conversant with applicable social conventions would have understood them to be adopting." Or, to put the point in slightly different terms, a judge interpreting a statute should ask "'what one would ordinarily be understood as saying, given the circumstances in which one said it.'"**
>
> Judge Frank Easterbrook has made the same points:
>
>> "Words are arbitrary signs, having meaning only to the extent writers and readers share an understanding. . . .

9

> Language in general, and legislation in particular, is a social enterprise to which **both speakers and listeners contribute, drawing on background understandings and the structure and circumstances of the utterance**."

*Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1766–67 (2020) (Alito, J., dissenting) (emphasis in bold added) (citations omitted). "Words must be read with the gloss of the experience of those who framed them." *United States v. Rabinowitz*, 339 U.S. 56, 70 (1950) (Frankfurter, J., dissenting) (quoted in Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 78 (2012) (discussing the Fixed-Meaning Canon and originalism)).

## C.

Viewed through this textual lens, Justice Gorsuch's insistence that "the right to a trial by jury for serious criminal offenses *meant* a trial before twelve members of the community—nothing less"[6] is belied by the text of the Sixth Amendment chosen by the Founders. To properly interpret the Sixth Amendment's guarantee of a trial by impartial jury in accordance with the original meaning as understood by a reasonable and informed ordinary citizen at the time, we can—and must—look beyond the broadest context of

---

[6] *Khorrami*, 143 S. Ct. at 23 (Gorsuch, J., dissenting).

the common law. We rightly look to the time, "structure and circumstances" in which it was written. *Bostock*, 140 S. Ct. at 1767 (Alito, J., dissenting).

Certainly, "trial by jury in criminal cases is fundamental to the American scheme of justice . . . ." *Duncan*, 391 U.S. at 149. As Justice Alito noted in his dissenting opinion in *Ramos* when addressing Justice Gorsuch's opinion for the Court and the criticism of *Williams*:

> No one questions that the Sixth Amendment incorporated *the core* of the common-law jury-trial right, but **did it incorporate *every feature*** of the right? Did it constitutionalize the requirement that there be 12 jurors even though nobody can say why 12 is the magic number? And did it incorporate features that we now find highly objectionable, such as the exclusion of women from jury service? At the time of the adoption of the Sixth Amendment (and for many years thereafter), women were not regarded as fit to serve as a defendant's peers. **Unless one is willing to freeze in place late 18th-century practice, it is necessary to find a principle to distinguish between the features that were incorporated and those that were not.** To do this, Justice White's opinion for the Court in *Williams* looked to the underlying purpose of the jury-trial right, which it identified as interposing a jury of the defendant's peers to protect against oppression by a "'corrupt or overzealous prosecutor'" or a "'compliant, biased, or eccentric judge.'" 399 U.S. at 100, 90 S.Ct. 1893 (quoting *Duncan*, 391 U.S. at 156, 88 S.Ct. 1444).

*Ramos*, 140 S. Ct. at 1433–34 (Alito, J., dissenting) (emphasis in bold added; italics original).

11

At the time the Sixth Amendment was written, concerns existed that (i) Article III's provision for trial by jury[7] failed to preserve the common-law right to be tried by a "jury of the vicinage," and (ii) there was not an express preservation of the right to jury trial in civil as well as criminal cases. *Williams*, 399 U.S. at 93–94. Given that circumstance, to address those concerns, James Madison proposed an amendment securing the right of trial by a jury that included the "accustomed requisites" in all criminal cases. However, after debate, the Sixth Amendment as we have it today does not include that language. *Id.* at 94–96.

Importantly, notwithstanding the rejection of the "accustomed requisites" language, both of the concerns raised at the time of drafting were addressed by the Founders. The text of the Sixth Amendment expressly requires a jury "of the State and district wherein the crime shall have been committed" (the vicinage concern), and the Seventh Amendment secures the

---

[7] Article III, Section 2 provides:

> The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.

right to trial by jury in civil cases.[8] No other "accustomed requisites" are required by the text of the Constitution or its amendments.

If the "accustomed requisites" had been required by the text of the Sixth Amendment, it seems clear twelve persons would have been required to constitute a jury. "[The inclusion of 'accustomed requisites'] would likely have eliminated any grounds for deviating from a rigid rule that only twelve-person juries can reach verdicts with integrity and reliability." *Lainhart v. State*, 351 So. 3d 1282, 1284 (Fla. 1st DCA 2022) (B.L. Thomas, J., concurring). Considering the absence of the "accustomed requisites" language, the more reasonable reading of the Sixth Amendment is that the Amendment does not

---

[8] One must ask: if the twelve-person jury is the only constitutionally acceptable jury in criminal cases, is the jury contemplated by the Sixth Amendment the same jury required by the Seventh Amendment for civil cases? The Seventh Amendment provides: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ." "[T]here is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932), as quoted in Scalia & Garner, *Reading Law, supra* at 170 ("A word or phrase is presumed to bear the same meaning throughout the text . . . ."). Further, in discussing jury trials in civil cases, Blackstone noted, "[The juror challenge process] is usually done, till the legal number of twelve be completed; in which patriarchal and apostolical number sir Edward Coke hath discovered abundance of mystery." 3 William Blackstone, *Commentaries on the Laws of England* 365.

13

*constitutionalize* all of the "accustomed requisites" of the common law as to the number of jurors required.

With this milieu, and in the absence of "accustomed requisites" language, to insist that the use of the word "jury" *mandates* precisely twelve jurors that was understood at common law disregards the context of the time, structure and circumstances giving rise to the Sixth Amendment. Indeed, relying exclusively on the common law to conclude twelve jurors are required by the Sixth Amendment is to conclude the Sixth Amendment brought in through the back door of implication what it did not bring in through the front door of the text.

Further, such conclusion also fails to acknowledge the foundational concept of federalism that divides political authority in our Republic between two different sovereign entities—the Nation and the States. Even assuming *arguendo* a majority of the other states rely on twelve-person juries, that does not limit the prerogatives of the citizens of the sovereign State of Florida.

> [T]he sovereign state of Florida, composed of approximately 22 million persons, is also entitled to the protections of the "written word" in the Sixth Amendment, and thus granted the flexible authority to rely on juries composed of six citizens as the Court upheld in *Williams*, or eight as in Arizona, or any other number of jurors more than five. And . . . common-law traditions that might have been incorporated into the text, *but were not*, [cannot]

14

negate this textual promise of flexibility in our federalist system of national governance.

*Id.* at 1287 (B.L. Thomas, J., concurring).

Indeed, the United States Supreme Court, as the Court itself has noted, must exercise great caution when endeavoring to intrude upon the just prerogatives of the citizens of Florida. *See generally Chandler v. Florida*, 449 U.S. 560, 579–80 (1981). The absence of such care is corrosive to the indispensable principle of federalism and the very structure of governmental authority in our Republic that was erected to secure our ordered liberty.

III.

The profound and harmful effects that would inevitably result to countless Floridians and victims of crimes (both past and present) from this pursued reversal of *Williams*—a case decided more than five decades ago— is difficult to overstate. As Judge Thomas rightly noted in his concurring opinion in *Lainhart*:

> Needless to say, as Arizona noted in its brief [filed in *Khorrami*], the impact of the United States Supreme Court's holding that Florida's six-person jury was unconstitutional in non-capital cases would be catastrophic in terms of criminal procedure, devastating to any notion of finality, and injurious to the rights of criminal victims . . . .
>
> > The real-world impact of a departure from *Williams*' holding would also be enormous. Florida, the third most-

15

populous state in the nation with roughly 22 million people, has approximately 3,500 criminal cases awaiting finality at any given time. Florida employs a six-member jury for *all* non-capital cases . . . . Consequently, Florida could be forced to retry *thousands of non-capital cases involving serious offenses* if the Court were to overrule *Williams*.

(Brief in Opposition at 27, *Khorrami*) (emphasis added).

And of course, were this judicial upheaval to occur, the next shoe to fall would be the assertion that the right applied *retroactively* on collateral review, potentially subjecting the state to enormous costs and pressures, and crime victims to suffer, in many thousands of criminal cases. In other words, no Florida non-capital criminal verdict of guilt (or those of five other states') would be final, should this occur.

*Lainhart*, 351 So. 3d at 1284–85 (B.L. Thomas, J., concurring).

Overturning *Williams*—more than half a century after it was decided—is not justified by the text of the Sixth Amendment. To do so would result in "judicial upheaval"—and those who would suffer would be the citizens of the sovereign State of Florida and countless victims of crimes. Timely access to Florida courts would be hindered for those with cases presently pending or otherwise coming before our courts. Further, as to cases that have been concluded, those victims and their families would suffer anew from their re-

16

opened wounds and be robbed of a vital aspect of the peace, incomplete as it is, that courts of law are able to offer them—finality.

IV.

Appellant's right to trial by impartial jury secured by the Sixth Amendment to the United States Constitution was not violated. Florida's use of six-person juries in non-capital criminal cases is consistent with the text, structure, and history of the United States Constitution. Accordingly, this Court has rightly affirmed his judgment and sentence.

JAY, J., concurs.

PRATT, J., concurring.

Simpson's attacks on his six-person jury were not raised below, so we review them for fundamental error. *See Jackson v. State*, 983 So. 2d 562, 568 (Fla. 2008); *State v. Johnson*, 616 So. 2d 1, 3 (Fla. 1993). They are easily dispatched in any event. *Williams v. Florida*, 399 U.S. 78 (1970), upheld Florida's six-person jury, and it flatly forecloses Simpson's Sixth Amendment claim. Simpson nonetheless directs our attention to what Judge Soud aptly describes as a "crescendoing critique of *Williams*," and Simpson asserts that *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), casts a shadow over *Williams*'s continued vitality. As Judge Soud's scholarly opinion explains, there is ample reason to doubt the predictions of *Williams*'s detractors. But more to the point, *Williams* indisputably remains good law, and lower courts—including the trial courts within our district—must not allow the scattered critiques of *Williams* to distract them from their duty to faithfully follow it. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) (lower courts must "follow the case that directly controls, leaving to [the Supreme] Court the prerogative of" harmonizing its own precedents (cleaned up)).

Simpson's claimed right to a twelve-person jury under the Florida Constitution—and his corresponding request that we certify a question of

18

great public importance to the Florida Supreme Court—fares no better. In article I, section 22, our state constitution dictates that "[t]he qualifications and the number of jurors, not fewer than six, shall be fixed by law." Art. I, § 22, Fla. Const. Notwithstanding this express allowance for six-person juries, Simpson asserts that his right to an "impartial jury" under article I, section 16, encompasses a right to a twelve-person jury. That argument ignores the fundamental maxim that "[i]t cannot be presumed that any clause in the constitution is intended to be without effect; and therefore such a construction is inadmissible, unless the words require it." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803). We properly decline Simpson's request to certify a question that asks the Florida Supreme Court effectively to delete a clause from the Florida constitution.

I write separately to address Simpson's claim that Florida's felon-in-possession statute, section 790.23(1)(a), Florida Statutes (2022), facially violates the Second Amendment. Simpson acknowledges that the Florida Supreme Court upheld the statute in *Nelson v. State*, 195 So. 2d 853 (Fla. 1967) (per curiam). But he correctly observes that much has changed in the Second Amendment landscape since *Nelson*. For the following reasons,

19

Judge Jay and I concur in the rejection of Simpson's facial challenge to section 790.23(1)(a).[1]

## I.

In *Nelson*, the Florida Supreme Court rejected a criminal defendant's challenge to the then-effective version of section 790.23, which prohibited felons from possessing "any pistol, sawed-off rifle or sawed-off shotgun." 195 So. 2d at 854 n.1. Like the current version, the statute imposed a lifetime ban, and it exempted only those "whose civil rights have been restored." *Id.* The indictment charged Nelson, an un-restored felon, with possessing a pistol. *Id.* at 854. Nelson attacked the statute on three grounds: the right-to-arms and due process guarantees of the Florida Constitution, and the

_____

[1] As with his federal and state constitutional challenges to his six-person jury, Simpson failed to raise his Second Amendment challenge in the trial court below. "A facial challenge to a statute's constitutional validity may be raised for the first time on appeal only if the error is fundamental." *State v. Johnson*, 616 So. 2d 1, 3 (1993). "[F]or an error to be so fundamental that it can be raised for the first time on appeal, the error must be basic to the judicial decision under review and equivalent to a denial of due process." *Id.* However, since *Johnson*, the Florida Supreme Court has reiterated that "'a conviction for the violation of a facially invalid statute would constitute fundamental error.'" *Westerheide v. State*, 831 So. 2d 93, 105 (Fla. 2002) (quoting *Trushin v. State*, 425 So. 2d 1126, 1129 (Fla. 1982)). Because Simpson asserts a facial challenge, his failure to raise it in the trial court does not bar our review.

Fourteenth Amendment to the United States Constitution. He did not assert a Second Amendment claim. *Id.*

The *Nelson* court began by citing precedent holding that the Florida Constitution's right-to-arms guarantee "'was not designed as a shield for the individual man . . . .'" *Id.* at 854 n.2 (quoting *Carlton v. State*, 58 So. 486, 488 (Fla. 1912)). The court next observed that "[i]n other jurisdictions, statutes prohibiting a felon from possessing firearms have been held valid," and it distinguished a contrary Ohio court decision. *Id.* at 854–55. *Nelson* specifically relied on a California court decision that employed rational-basis review, and it quoted with approval the court's determination that felon disarmament had "'a reasonable basis,'" as well as the court's deference to "'the judgment and discretion of the Legislature.'" *Id.* at 854 n.4 (quoting *People v. Camperlingo*, 231 P. 601, 604 (Cal. App. 1924)).

*Nelson* next shifted gears to federal law. Asserting that the Second Amendment and the Florida Constitution's right to bear arms "are quite similar," *Nelson* took note of a federal statute that the court thought analogous to Florida's felon-in-possession ban. *Id.* at 855. The federal statute prohibited "commerce in arms by persons convicted of" crimes of violence. *Id.* at 855 & n.7. *Nelson* observed that the U.S. Court of Appeals for the First Circuit had rejected a Second Amendment challenge to the

21

statute, "holding the purpose of the [statute] being to protect the public by preventing the possession of firearms by persons convicted of certain crimes or who are fugitives from justice." *Id.* at 855 (citing *Cases v. United States*, 131 F.2d 916 (1st Cir. 1942)).

The court then turned its gaze back to section 790.23 and quickly concluded its opinion:

> We think the purpose of the Florida Statute is fairly comparable with that of the Federal Statute. The statutory prohibition of possession of a pistol by one convicted of a felony, civil rights not restored, is a reasonable public safeguard. We uphold the validity of § 790.23 and affirm the judgment appealed from.

*Id.* at 855–56 (footnotes omitted).

## II.

Much has changed in the 56 years since the Florida Supreme Court decided *Nelson*. The U.S. Supreme Court has now held that the Second Amendment secures an individual right to keep and bear arms for self-defense, *see District of Columbia v. Heller*, 554 U.S. 570 (2008), and that the Fourteenth Amendment makes this right enforceable against state and local governments, *see McDonald v. Chicago*, 561 U.S. 742 (2010). The Court also has held that just as the First Amendment extends to modern communication methods and the Fourth Amendment extends to modern search techniques, the Second Amendment extends to modern arms. *See*

22

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curiam) (stun guns); *see also Heller*, 554 U.S. at 582 (striking down a handgun ban and rejecting as "bordering on the frivolous" the argument "that only those arms in existence in the 18th century are protected by the Second Amendment"). Finally, the Court has held that the right to "bear" arms includes the right to carry firearms in public for self-defense, and states may not condition the exercise of this right on a showing of "a special need for self-protection." *See New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2156 (2022) ("*NYSRPA*") (internal quotation marks omitted).

While the Supreme Court has yet to confront a Second Amendment challenge to a felon dispossession statute like section 790.23(1)(a), it has clarified the framework for analyzing Second Amendment claims. In *Heller*, the Court looked to the text of the Second Amendment and to relevant Anglo-American historical tradition from enactment of the English Bill of Rights through Reconstruction. It did so because "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right," 554 U.S. at 592, and because the sources it surveyed offered probative evidence of the "public understanding" of the right, *id.* at 605 (emphasis removed). The Court squarely rejected interest-balancing approaches, and the rational-basis test

23

in particular, reasoning that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id.* at 634–35.

Later, in *NYSRPA*, the Court rejected as "one step too many" the two-step framework that proliferated in the lower courts after *Heller*. 142 S. Ct. at 2127. Rather than ask whether an arms regulation "promotes an important interest"—a resurrection of the interest-balancing approach that Justice Breyer proposed in his *Heller* dissent—a court must instead ask whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does, "the Constitution presumptively protects that conduct," and the court must then ask whether the government has carried its burden to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Stated another way, where an individual's conduct falls within the Second Amendment's text, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. This historical reasoning "will often involve reasoning by analogy—a commonplace task for any lawyer or judge," *id.* at 2132—and it requires an

assessment of "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense," *id.* at 2133.

*NYSRPA* also clarified which historical practices shed light on original meaning. Ratification-era traditions will carry the most weight. On the other hand, "[h]istorical evidence that long predates" ratification of the Second Amendment in 1791 and ratification of the Fourteenth Amendment in 1868 "may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id.* at 2136. This is especially true where a tradition is both distant from the founding and fleeting. "A long, unbroken line of common-law precedent stretching from Bracton to Blackstone is far more likely to be part of our law than a short-lived, 14th-century English practice." *Id.* On the other end of the temporal spectrum, "we must also guard against giving postenactment history more weight than it can rightly bear." *Id.* While post-ratification history can help liquidate ambiguous constitutional text, it cannot "overcome or alter" the "original meaning of the constitutional text." *Id.* at 2137 (internal quotation marks omitted). And its modest probative weight degrades over time. For example, post-Civil War sources "'do not provide as much insight into [the Second Amendment's] original meaning as earlier sources.'" *Id.* (quoting *Heller*, 554 U.S. at 614).

*NYSRPA* identified several circumstances in which its historical inquiry "will be fairly straightforward." *Id.* at 2131. First, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* Second, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* And third, "if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." *Id.*

### III.

*Nelson* stands in tension with these jurisprudential developments. It reflexively upheld section 790.23 as a "reasonable public safeguard" based on the State's interest in protecting the public. 195 So. 2d at 855–56. It did so without any textual or historical analysis. Instead, it employed a watered-down rational-basis standard even more deferential to the legislature than the "interest balancing" approach that the U.S. Supreme Court has now unequivocally repudiated. And more fundamentally, *Nelson* accepted the

26

core mistaken premise that *Heller* rejected—that the right to arms is not an individual right. *See id.* at 854 n.2 (quoting *Carlton*, 58 So. at 488).

All that said, the U.S. Supreme Court has not weighed a felon-in-possession ban. Therefore, *Nelson* remains binding precedent for our court. But we don't think *Nelson* ties our hands here. As recounted above, *Nelson* rejected a *state* constitutional attack on section 790.23, and the defendant there did not raise a Second Amendment claim. True, *Nelson* did rely on federal precedent construing the Second Amendment, and it justified that reliance upon the similarity between the state and federal constitutional rights to arms. But the Florida Supreme Court has since been careful to categorize *Nelson* as a case construing the *state* constitutional right to bear arms, rather than one construing the Second Amendment. *See, e.g.*, *Norman v. State*, 215 So. 3d 18, 34–35 (Fla. 2017).

One might nonetheless posit that *Nelson*'s rejection of a Fourteenth Amendment challenge forecloses Simpson's federal constitutional claim because of the mechanics of incorporation. As a technical matter, the Fourteenth Amendment—and not the Second Amendment—is what guarantees a federal right to keep and bear arms as against the State. *See McDonald*, 561 U.S. 742. But the *Nelson* defendant could not have raised an incorporated right-to-arms claim. The U.S. Supreme Court did not hold the

27

right to keep and bear arms applicable to the states until more than four decades after *Nelson*, *see id.*, and before that, the Court had refused to incorporate the right, *see Presser v. Illinois*, 116 U.S. 252 (1886). Indeed, *Nelson* described the claim that it rejected as one sounding in equal protection: a claim that "the Legislature may not 'single out persons who have been convicted of crime and create of them a special class who shall be deprived of constitutionally protected rights unrelated to their punishment.'" 195 So. 2d at 854.

Here, Simpson asserts a Second Amendment claim—a claim not before the court in *Nelson*. Because *Nelson* does not speak to Simpson's Second Amendment claim, Simpson raises a matter of first impression. Accordingly, we will address how the *NYSRPA* framework applies to section 790.23(1)(a).

**A.**

At the outset, as a general proposition, the Second Amendment's plain text covers the ownership and possession of a firearm by a felon who has completed his sentence and returned to the community. To be sure, as the State stresses, *Heller*, *McDonald*, and *NYSRPA* all spoke of the right of "law-abiding" and "responsible" citizens to keep and bear arms. And both *Heller* and *McDonald* assured that "longstanding" felon dispossession laws are

28

"presumptively lawful." *McDonald*, 561 U.S. at 786 (plurality); *Heller*, 554 U.S. at 626–27, 627 n.26. But these statements were dicta; none of the Court's cases placed the plaintiffs' criminal histories at issue or analyzed a felon disarmament regime. *Range v. Att'y Gen.*, 69 F.4th 96, 101 (3d Cir. 2023) (en banc). They also don't bear the weight that the State would have us place on them. That "longstanding" regulations are "presumptively lawful" does not tell us whether a particular regulation is "longstanding." Nor does it foreclose all challenges that seek to rebut the presumption of lawfulness. Presumptions are guideposts, not gospels. *See Folajtar v. Att'y Gen.*, 980 F.3d 897, 913 (3d Cir. 2020) (Bibas, J., dissenting).

What's more, the Court's exposition of the constitutional text counsels against reading too much into these dicta. *Heller* noted that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset," 554 U.S. at 580, and it therefore proceeded from "a strong presumption that the Second Amendment right . . . belongs to all Americans," *id.* at 581. *See United States v. Rahimi*, 61 F.4th 443, 451–53 (5th Cir. 2023), *cert. granted*, No. 22-915, 2023 WL 4278450 (U.S. June 30, 2023); *Range*, 69 F.4th at 101–03. Indeed, where the Constitution extends its protections to only a subset of "the people" and excludes those convicted

29

of crimes, it says so. *See* Amend. XIV, § 2, U.S. Const. (exempting states' disenfranchisement "for participation in rebellion, or other crime," from its reduced-representation penalty); *Richardson v. Ramirez*, 418 U.S. 24 (1974) (upholding felon disenfranchisement).

Thus, an un-incarcerated felon's keeping or bearing of a firearm falls within the Second Amendment's text. *See Range*, 69 F.4th at 103. This is not to say that felon dispossession laws necessarily defy the Second Amendment. As the en banc Third Circuit, the Fifth Circuit, and then-Judge Amy Coney Barrett have observed, that one is a member of "the people" to whom the right to keep and bear arms is guaranteed does not foreclose the State's authority to strip him of the right. *Range*, 69 F.4th at 102; *Rahimi*, 61 F.4th at 452; *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting). It simply means that the State will have to identify a national tradition that justifies its disarmament policy.

## B.

The search for relevant and probative historical analogues to section 790.23(1)(a) must begin with a consideration of "how and why" the statute burdens self-defense. *NYSRPA*, 142 S. Ct. at 2133.

As for "how," the statute criminalizes the ownership and possession of firearms, ammunition, and electric weapons—and the concealed carry of any

30

weapon—by all persons "[c]onvicted of a felony in the courts of this State[.]" § 790.23(1)(a). The statute imposes a lifetime ban, does not distinguish between type or recency of felony convictions, and exempts from its categorical prohibition only those whose civil rights and firearm authority are restored or whose minor criminal history records are expunged. § 790.23(1)(a), (2).

As for "why," the statute appears to serve multiple goals. In its application to violent felons, it protects the public from those who pose a danger if armed. *See State v. Snyder*, 673 So. 2d 9, 10 (Fla. 1996). In its application to non-violent felons, it likely advances a different purpose— perhaps one of disarming those who have shown poor virtue, judgment, or character by committing offenses sufficiently blameworthy to be deemed felonies.

The closest and most obvious comparator to section 790.23(1)(a) is its federal counterpart, 18 U.S.C. § 922(g)(1), which prohibits the possession of firearms and ammunition by those "convicted in any court of, a crime punishable by imprisonment for a term exceeding one year." But the federal statute's vintage is indisputably modern—Congress enacted it in 1938. And even then, section 922(g)(1) disarmed only *violent* felons until 1961, when Congress amended the statute to cover all felons. *See Range*, 69 F.4th at

31

104. Furthermore, state felon-in-possession predecessors to section 922(g)(1) emerged in the 1920s. *See id.* at 104 n.8. As *NYSRPA* explains, whatever modest probative weight a post-ratification "tradition" can carry, it offers scant evidence of original meaning when its roots reach no further than the twentieth century. *Cf.* 142 S. Ct. at 2156 (rejecting New York's proffer of "a few late-19th-century outlier jurisdictions"); *id.* at 2154 n.28 (refusing to address "20th-century historical evidence").

Analogues that pre-date twentieth-century felon-in-possession bans present a less precise fit. For one thing, even if the State could point to a colonial, founding-era, or antebellum felon disarmament regime, it necessarily would have a narrower scope than section 790.23(1)(a) due to continuous expansion of the "felony" label. During the colonial period, one could count on two hands the list of common-law felonies, *see Folajtar*, 980 F.3d at 904 n.9, but as "the connection between felonies and capital punishment started to fray," legislatures' "number of designated felonies continued to grow." *Kanter*, 919 F.3d at 459 (Barrett, J., dissenting). "The category of felonies is manipulable and less serious than it was" earlier in our history. *Folajtar*, 980 F.3d at 920 (Bibas, J., dissenting). "[T]oday, felonies include a wide swath of crimes, some of which seem minor." *Range*, 69 F.4th at 102.

Regardless, the State does not bring to our attention any categorical, lifetime felon-in-possession bans that pre-date the twentieth century, and close studies of the history have located none. *Id.* at 103–05; *Rahimi*, 61 F.4th at 456–60; *Folajtar*, 980 F.3d at 914–18 (Bibas, J., dissenting); *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) (noting that "scholars have not been able to identify" founding-era categorical, lifetime felon dispossession laws). Instead, the State points us to an array of court decisions and academic articles that discuss various other kinds of disarmament policies in seventeenth- and eighteenth-century England, the colonial period, the founding era, and the early Republic.[2] The most noteworthy examples are:

- The Militia Act of 1662 empowered royal officers to disarm those "'dangerous to the Peace of the Kingdom.'" *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting) (quoting Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13 (1662)).[3]

---

[2] A couple of the academic articles assert a founding-era practice of disarming felons, but as Judge Stephanos Bibas carefully has explained, those articles "are like the layers of a matryoshka doll"; they cite each other, but none cite any primary sources that support their assertion. *See Folajtar*, 980 F.3d at 915–16 (Bibas, J., dissenting).

[3] We largely rely on then-Judge Amy Coney Barrett's *Kanter* dissent because she is credited with first compiling and analyzing these historical materials in one opinion, and with building upon Judge Thomas Hardiman's earlier analysis. Other judges have since extensively relied on her work. *See, e.g.*, *Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting) ("I draw heavily on then-Judge Barrett's research below, which goes well beyond the sources in *Binderup [v. Attorney General*, 836 F.3d 336 (3d Cir. 2016) (en banc)].").

33

- At common law, it was an offense to go "'armed to terrify the King's subjects,'" and violators risked not only imprisonment, but also forfeiture of their "'armour.'" *Id.* (quoting *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686)). "This common law offense persisted in [early] America and was in some cases codified," although provisions for forfeiture of offenders' weapons were repealed during the early Republic. *Rahimi*, 61 F.4th at 457–58.

- Amidst Protestant fears of violent revolt, Parliament disarmed Catholics. Disarmament of Catholics continued in the Colonies and later the States during the Revolutionary War—a consequence of disarming those "who refused to swear an oath of allegiance." *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting).

- During the Revolutionary War, loyalists to the Crown likewise fell subject to disarmament when they refused to pledge their allegiance to the state or the United States. *Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting).

- In the wake of Shays' Rebellion, Massachusetts made rebel participants "swear allegiance and give up their arms for three years before they could be pardoned." *Id.*

- Throughout early American history, "[s]laves and Native Americans . . . were thought to pose more immediate threats to public safety and stability and were disarmed as a matter of course." *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting).

As Judge Stephanos Bibas and then-Judge Barrett thoroughly have explained, these policies made danger—not civic virtue—the relevant consideration for whether an individual or a class of individuals could be disarmed. *See Folajtar*, 980 F.3d at 914–18 (Bibas, J., dissenting); *Kanter*, 919 F.3d at 454–62 (Barrett, J., dissenting). Those disloyal to the Crown, the

34

States, and the United States had to forfeit their arms not because they lacked virtue, but because they posed a palpable threat of armed revolt. *See Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting). And putting aside the obvious conflict with later-enacted constitutional amendments, the same danger of armed revolt spurred early America's disarmament of Catholics, slaves, and Native Americans. *See Kanter*, 919 F.3d at 457–58 (Barrett, J., dissenting).

In the end, "[t]he only evidence coming remotely close" to a founding-era legislative power to "permanently dispossess all felons" stems from suggested right-to-arms provisions that surfaced during three state ratifying conventions. *Id.* at 454. The New Hampshire convention recommended for inclusion in a bill of rights: "'Congress shall never disarm any citizen, *unless such as are or have been in actual rebellion*.'" *Id.* (quoting 1 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 326 (2d ed. 1891) (emphasis added)). During the Massachusetts convention, Samuel Adams proposed: "'And that the said Constitution be never construed to authorize Congress to . . . prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms.'" *Id.* (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 675, 681 (1971) (emphasis added)). And the Pennsylvania Minority suggested: "'That the people have a right to bear arms

35

for the defense of themselves and their own State or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them *unless for crimes committed, or real danger of public injury from individuals . . . .*'" *Id.* at 455 (quoting 2 Schwartz at 662, 665 (emphasis added)).

These ratifying convention proposals offer only limited insight into the original meaning of the people's right to keep and bear arms. "[N]one of the relevant limiting language" from the proposals "made its way into the Second Amendment," and "only New Hampshire's proposal—the least restrictive of the three—even carried a majority of its convention." *Id.* In addition, the proposed right-to-arms provisions of other state ratifying conventions "did not contain similar language of limitation or exclusion." *Id.* Nor did such language "appear in any of the four parallel state constitutional provisions enacted before ratification of the Second Amendment." *Id.* But taking the New Hampshire, Samuel Adams, and Pennsylvania Minority proposals so far as they go, only the Pennsylvania Minority proposal might lend support to a policy of across-the-board disarmament of those with criminal convictions. *See id.* at 456. Even then, such an interpretation is debatable, *see id.*, and in any event, lone and transient "outliers" do not establish a national historical tradition, *see NYSRPA*, 142 S. Ct. at 2133, 2153, 2156.

36

## C.

While it's clear that section 790.23(1)(a) does not mirror its historical predicates, it's equally clear that the statute is facially constitutional. *NYSRPA* does not require the State to identify "a historical *twin*," but instead "a well-established and representative historical *analogue*." 142 S. Ct. at 2133. By that metric, the above-described historical record supports disarming felons whose prior convictions show that they pose a danger to the public if armed. *Folajtar*, 980 F.3d at 913 (Bibas, J., dissenting); *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting). In addition, Florida's felon-in-possession ban has some applications that *precisely* track early American disarmament policies. For example, it disarms those who "levy war against" the State or give "aid and comfort" to its enemies, *see* § 876.32, Fla. Stat. (2023), as well as those who advocate the violent overthrow of our state or federal governments or the assassination of government officials, *see* § 876.02(1), Fla. Stat. (2023). The historical record places beyond any doubt the lawfulness of disarming traitors and rebels.

Because section 790.23(1)(a) has a variety of valid applications, it satisfies the standard for facial constitutionality. *See Fla. Dep't of Rev. v. DIRECTV, Inc.*, 215 So. 3d 46, 50 (Fla. 2017) (describing the no-set-of-circumstances test for facial challenges); *accord Edenfield v. State*, 48 Fla.

37

L. Weekly D1113 (Fla. 1st DCA May 31, 2023) (holding that section 790.23(1)(a) is facially constitutional).

## IV.

Having concluded that Simpson's facial attack on section 790.23(1)(a) fails, we turn to his alternative request that we certify his question to the Florida Supreme Court. While the validity of Florida's felon-in-possession ban undoubtedly is an important question, several features of this case make it a poor candidate for certification.

At the outset, as with his federal and state constitutional attacks on his six-person jury, Simpson failed to raise his Second Amendment challenge in the trial court. This fact does not operate as a bar to appellate review, *see Westerheide*, 831 So. 2d at 105, but it does cut against Simpson's certification request. There is at least some amount of friction between Simpson's assertion that his question is of great public importance and his failure to raise that question below. Moreover, in failing to afford the trial court an opportunity to pass on the question that he now presses, Simpson's leap-frogging would deprive the Florida Supreme Court of the benefit of the two-tiered review that typically precedes its judgments (or at least those judgments that don't fall within the limited categories of cases in which the

38

court directly reviews certain trial-court decisions, *see* art. V, § 3(b)(1), 3(b)(2), 3(b)(5), Fla. Const.).

Even if Simpson had raised his facial challenge to section 790.23(1)(a) below, such challenges are disfavored vehicles for breaking new precedential ground. "Although passing on the validity of a law wholesale may be efficient in the abstract, any gain is often offset by losing the lessons taught by the particular, to which common law method normally looks. Facial adjudication carries too much promise of 'premature interpretatio[n] of statutes' on the basis of factually barebones records." *Sabri v. United States*, 541 U.S. 600, 608–09 (2004) (quoting *United States v. Raines*, 362 U.S. 17, 22 (1960)). The "delicate power" of judicial review "is not to be exercised with reference to hypothetical cases," *Raines*, 362 U.S. at 22, and it is not within the judiciary's "traditional institutional role to resolve questions of constitutionality with respect to each potential situation that might develop," *Gonzalez v. Carhart*, 550 U.S. 124, 168 (2007). "For this reason, as-applied challenges are the basic building blocks of constitutional adjudication." *Id.* (cleaned up).

Furthermore, the change in analytical framework between *Nelson* and *NYSRPA* is least likely to be outcome-determinative in a facial challenge. "'A facial challenge to a legislative Act is . . . the most difficult challenge to

39

mount successfully, since the challenger must establish that no set of circumstances exist under which the Act would be valid.'" *DIRECTV*, 215 So. 3d at 50 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). As the facts of Simpson's own prosecution show, that standard presents a tall order. It's one thing to ask, "Why can't Martha Stewart have a gun?" or "Why can't Bryan Range have a gun?" *See* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695 (2009); *Range*, 69 F.4th 96 (sustaining as-applied challenge to federal dispossession law by man with decades-old conviction for under-reporting income on a food-stamps application). It's quite another to ask the same of *all* felons, including Simpson himself—a habitual violent felon now serving a 30-year sentence for attempted second-degree murder.

If the State can disarm dangerous felons—and it almost certainly can— Simpson stands near the very front of the queue. His own case presents an application of section 790.23(1)(a) that survives the *NYSRPA* framework. We see little value in asking the Florida Supreme Court to expend valuable judicial labor on a habitual violent felon's facial challenge only to give the same answer that *Nelson* gave (albeit through a very different analytical lens). Such an answer won't provide much guidance on the cases where the *NYSRPA* framework is most likely to make a difference—as-applied

40

challenges brought by non-violent, non-habitual convicts that pose no danger to the public. *See, e.g.*, *Range*, 69 F.4th 96.

Finally, recent and forthcoming developments in the U.S. Supreme Court's docket counsel against jumping the gun on certification. The Court has granted certiorari in *Rahimi*, which presents the question whether the federal ban on possessing a firearm while under a domestic violence restraining order, 18 U.S.C. § 922(g)(8), facially violates the Second Amendment. 61 F.4th 443, *cert. granted*, No. 22-915, 2023 WL 4278450 (U.S. June 30, 2023). And the United States may soon seek the Court's review in *Range*, which presents an as-applied Second Amendment challenge to 18 U.S.C. § 922(g)(1), the federal felon dispossession statute. 69 F.4th 96. The Court's forthcoming decision in *Rahimi* may provide key guidance to lower courts grappling with post-*NYSRPA* Second Amendment challenges to felon dispossession laws like section 790.23(1)(a). And should the Court grant review and issue a decision on the merits in *Range*, the Court could provide an answer to the very question that Simpson asks us to certify.

**V.**

For over a decade, lower courts resisted *Heller* and treated the Second Amendment not as a pre-existing right guaranteed in the text of the Constitution, but instead as a consideration that yields to governmental

41

interests. With few notable exceptions, *e.g.*, *Wrenn v. District of Columbia*, 864 F.3d 650, 666 (D.C. Cir. 2017), they consulted history to determine the scope of the right, only then to rubber-stamp infringements under a test nominally called "intermediate scrutiny," but in fact "indistinguishable from rational-basis review." *Silvester v. Becerra*, 138 S. Ct. 945, 945 (2018) (Thomas, J., dissenting from denial of certiorari). So great was their deference to legislatures over the Constitution that many allowed their "two-step" method to effectively erase the right to "bear" arms, reducing the Second Amendment to only a right to "keep" them. *See Peruta v. California*, 137 S. Ct. 1995, 1999 (2017) (Thomas, J., dissenting from denial of certiorari) (collecting pre-*NYSRPA* cases that rejected right-to-carry claims).

During the same period that they stunted the Second Amendment, many lower courts rushed to assert new rights elsewhere, even anticipatorily overruling the Supreme Court in their race to do so. *E.g.*, *Obergefell v. Hodges*, 576 U.S. 644, 663, 681–85 (2015) (citing scores of lower court decisions that disregarded *Baker v. Nelson*, 409 U.S. 810 (1972)); *id.* at 675 (acknowledging that *Baker* controlled the lower courts by declaring that "*Baker v. Nelson* must be and now is overruled"); *Hand v. Scott*, 888 F.3d 1206, 1208 (11th Cir. 2020) ("The district court concluded that, '[u]nlike a fine wine, [*Beacham v. Braterman*, 396 U.S. 12 (1969)] has not aged well,' but it

42

remains binding precedent that cannot, as the district court suggested, simply be ignored." (cleaned up)). The remarkable contrast between lower courts' "'second-class'" treatment of the pre-existing right to keep and bear arms, *NYSRPA*, 142 S. Ct. at 2156 (quoting *McDonald*, 561 U.S. at 780 (plurality)), and their energetic assertion of new rights is not something that we should perpetuate.

Thankfully, we do not believe that our affirmance of Simpson's conviction and sentence for possession of a firearm commits the wrong that *NYSRPA* extirpated. While the Second Amendment is not a *tabula rasa* into which judges or legislatures may engrave their own notions of the public good, it is not "a regulatory straightjacket" either. *Id.* at 2133. It codifies a pre-existing right with a defined scope—that which the American people understood it to have when they ratified it. *Heller*, 554 U.S. at 634–35. Those regulations that partake in "the historical tradition that delimits the outer bounds of the right to keep and bear arms" do not infringe the right. *NYSRPA*, 142 S. Ct. at 2127. As measured against Simpson's facial challenge, section 790.23(1)(a) is such a regulation.

For the foregoing reasons, we concur in the affirmance of Simpson's convictions and sentences, as well as the denial of Simpson's request that we certify his questions to the Florida Supreme Court.

JAY, J., concurs.